## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------------------x
JAMES LACOURTE, on behalf of himself and all  )
others similarly situated,                     )          Civil Action No:
                                               )
                Plaintiff,                     )          JURY TRIAL DEMANDED
                                               )
        -against-                              )
                                               )
JPMORGAN CHASE & CO., NCO GROUP, INC., )
ONE EQUITY PARTNERS, FOSTER & GARBUS)
LLP and DOES 1 THROUGH 150 LAW FIRM  )
AFFILIATES OF NCO GROUP, INC.,                 )
                                               )
                Defendants.                    )
---------------------------------------------------------x
```

DEC 2 8 2012

U.S.D.C. S.D.N.Y.
CASHIERS

## CLASS ACTION COMPLAINT

1.    Plaintiff, James LaCourte, by and through his counsel of record, on behalf of himself and all others similarly situated, on behalf of the Class and Subclasses defined herin, alleges the following, upon information and belief, against Defendants JPMorgan Chase & Co., NCO Group, Inc., One Equity Partners, Foster & Garbus LLP, and Does 1 through 150 Affiliate Law Firms of NCO Group, Inc. ("Defendants"), for violation of the Fair Debt Collection Practices Act, 18 U.S.C. §1692 *et seq.*, the Fair Credit Reporting Act, 18 U.S.C. 1681 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), the New York General Business Law §349, and New York Judiciary Law §487 as follows:

### NATURE OF THE ACTION

2.    Plaintiff brings this action on behalf of himself and a Class and Subclasses of consumers who have been the subject of unlawful debt collection and credit reporting practices, including lawsuits, for debts which they do not owe as a result of Defendants' improper,

unlawful and deceptive acts and practices of attempting to reduce consumer debt, irrespective of its validity, to court judgments. As alleged herein, Defendants systematically and willfully violate the Fair Debt Collection Practices Act ("FDCPA"), the Fair Credit Reporting Act ("FCRA"), the Racketeer Influenced Corrupt Organizations Act ("RICO"), New York General Business Law ("GLB") Section 349 and New York Judiciary Law Section 487, in their efforts to mass generate judgment accounts from consumer collection accounts, while knowing, or intentionally failing to know, that the consumers do not owe the underlying debt, in whole or in part. Defendants intentionally do not obtain, or cannot obtain, proof that the consumers actually owe the alleged debt, in whole or in part.

## JURISDICTION AND VENUE

3.     Plaintiff invokes the subject matter jurisdiction of this Court pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for all civil actions arising under the laws of the United States, and pursuant to 15 U.S.C. §1692k(d) and 18 U.S.C. §§ 1961-68. This Court has supplemental jurisdiction over the Plaintiff's state law and common law claims pursuant to 28 U.S.C. §1367(a).

4.     This Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged herein took place in New York. Defendants are authorized to do business in New York and have sufficient minimum contacts with New York so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

5.     Venue is proper in this District under 28 U.S.C. §1391 and 18 U.S.C. §1965.

## THE PARTIES

6.      Plaintiff James LaCourte is domiciled in, and is a citizen of, Huntington, New York.

7.      Defendant NCO Group, Inc. ("NCO"), a Delaware corporation headquartered at 507 Prudential Road, Horsham, Pennsylvania, 19044, is the largest debt collector in the United States with an annual revenue of $1.2 billion in 2011. NCO is an indirect majority owned and controlled subsidiary of JPMorgan Chase. NCO is a holding company and conducts substantially all of its business operations through its subsidiaries. NCO interfaces with consumers through a network of wholly-owned subsidiaries operating as debt collection agencies, including, but not limited to, the following, as well as other entities d/b/a NCO: AC Financial Services, Inc.; AssetCare, Inc.; Compass International Services Corporation; Compass Teleservices, Inc.; FCA Funding, Inc.; FCA Leasing, Inc.; JDR Holdings, Inc.; NCO ACI Holdings, Inc.; RMH Teleservices, Inc.; NCO Financial Systems, Inc.; NCO Funding Inc.; Management Adjustment Bureau Funding, Inc.; and NCPM Acquisition Corp. NCO also interfaces with consumers through a network of attorney law firm affiliates, including Foster & Garbus LLP and Does 1 – 150, retained for the purpose of suing consumers and debtors of NCO or its creditor clients. NCO is controlled by JP Morgan Chase and One Equity Partners. NCO is a debt collector and furnisher of information to credit reporting agencies.

8.      Defendant JP Morgan Chase & Co. ("Chase") maintains corporate headquarters at 270 Park Avenue, New York, New York, 10017-2070. JP Morgan Chase & Co. provides investment banking, financial services for consumers and businesses, financial transaction processing, asset and wealth management and private equity services. Chase is a debt collector

and furnisher of information to credit reporting agencies.

9.     Defendant One Equity Partners is headquartered in New York City and incorporated in the Cayman Islands. One Equity Partners is the private equity arm of Chase and the majority shareholder of NCO, owning approximately 85% of the common stock of NCO. One Equity Partners is a debt collector and furnisher of information to credit reporting agencies.

10.    Defendant Foster & Garbus LLP ("Foster & Garbus") is a law firm and debt collector located at 60 Motor Parkway, Commack, New York 11725. Foster & Garbus LLP is one of the approximately 150 Affiliated Law Firms of NCO Group, Inc. Foster & Garbus is a debt collector and furnisher of information to credit reporting agencies.

11.    Defendant Does 1 through 150 are the nationwide Affiliated Law Firms of Defendant NCO Group, Inc. which operate across the nation on behalf of NCO Group, Inc. for the purpose of debt collections and filing of debt collection lawsuits against consumers. Although the names and locations of the Defendant Does 1 through 150 are not known to Plaintiff at this time, Defendant Does 1 through 150 can be readily identified in the books and records of Defendant NCO Group, Inc. Does 1 through 150 Affiliated Law Firms are debt collectors and furnishers of information to credit reporting agencies.

## STATEMENT OF FACTS

### Plaintiff James LaCourte's Factual Allegations

12.    Plaintiff James LaCourte was the holder of an American Express credit or charge card.

13.    In or about February 2009, Mr. LaCourte negotiated a full settlement of his

4

American Express credit or charge card debt with defendant NCO's wholly-owned subsidiary, NCO Financial Systems, Inc., a debt collector who had been retained by American Express. That settlement agreement is reflected in NCO's account records pertaining to Plaintiff. Beginning in April, 2009 and continuing through August 2010, Plaintiff LaCourte made the agreed settlement payments in the total amount of $4,128.02 to completely repay his debt to American Express. Accordingly, as of August 2010, Plaintiff LaCourte owed no monies to American Express.

14.     Nevertheless, beginning in October 2010, after Plaintiff LaCourte had fully repaid his debt to American Express, NCO and Foster & Garbus launched an abusive and harassing debt collection campaign falsely representing that Plaintiff LaCourte owed a debt to American Express in the amount of $2,752.01 and demanding by mail and telephone on at least twenty-eight separate occasions, that Plaintiff LaCourte pay $2,752.01. Those false, abusive and harassing debt collection telephone calls or letters were made or sent on the following dates, among others, over the United States mails and wires: October 18, 2010 (letter), October 20, 2010 (telephone call), October 27, 2010 (telephone call), November 4, 2010 (telephone call), November 11, 2010 (telephone call), November 17, 2010 (telephone call), November 24, 2010 (telephone call), December 9, 2010 (letter), December 10, 2010 (letter), December 13, 2010 (telephone call), December 17, 2010 (telephone call), December 20, 2010 (telephone call), December 21, 2010 (telephone call), December 29, 2010 (telephone call), January 3, 2011 (telephone call), January 4, 2011 (telephone call), January 7, 2011 (telephone call), January 11, 2011 (telephone call), January 18, 2011 (telephone call), January 21, 2011 (telephone call), January 27, 2011 (telephone call), February 2, 2011 (telephone call), February 17, 2011 (telephone call), February 21, 2011 (letter), February 22, 2011 (letter), February 23, 2011

(telephone call), February 25, 2011 (telephone call), December 29, 2011 (telephone call).

15.    In communications with NCO or Foster & Garbus since September 2010, Plaintiff LaCourte informed NCO and Foster & Garbus that he did not owe any debt to American Express, including specifically the debt falsely and repeatedly demanded by NCO and Foster & Garbus.

16.    Nevertheless, on January 17, 2011, NCO retained Foster & Garbus to file a lawsuit against Plaintiff LaCourte in the New York state courts concerning the same credit card debt which had been settled with NCO Financial Systems, Inc., and paid in full by Mr. LaCourte. The action was captioned *American Express Centurion Bank v. James LaCourte,* Index No. 714/11, State of New York, County of Suffolk, 2nd District Babylon (the "*LaCourte Action*").

17.    Prior to filing the lawsuit on behalf of (but without the involvement of) American Express, demanding $2,752.01 plus interest, NCO's records indicate that it sent its files concerning Plaintiff to Foster & Garbus. Those files reflected Plaintiff's full settlement of his American Express debt.

18.    Foster & Garbus signed the complaint in the *LaCourte Action* pursuant to the New York Rules of the Chief Administrator, Part 130-1.1a, certifying that, "to the best of that person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, (1) the presentation of the paper or the contentions therein are not frivolous as defined in section 130-1.1(c) of this Subpart, and (2) where the paper is an initiating pleading, (i) the matter was not obtained through illegal conduct, or that if it was, the attorney or other persons responsible for the illegal conduct are not participating in the matter or sharing in any fee

earned therefrom, and (ii) the matter was not obtained in violation of 22 NYCRR 1200.41-a."

(Emphasis added).

19.    As recently as January 4, 2012, NCO's files state that neither NCO nor Foster &
Garbus had received any "media" concerning the debt they alleged was owed by Plaintiff.
Nevertheless, NCO and Foster & Garbus, knowing they did not possess any "media" (or back-up
information), attempted to collect a false debt from Plaintiff, which both NCO and Foster &
Garbus knew was false, on at least twenty-eight occasions by mail or telephone, and filed a
lawsuit against him in a state court.

20.    On February 25, 2011, Plaintiff filed an Answer in the *LaCourte Action* denying
all claims made by NCO and Foster & Garbus in the name of American Express. Plaintiff
undertook the expense of preparing, filing and serving that Answer. Plaintiff incurred additional
expense as a result of attending court appearances in the *LaCourte* Action. Plaintiff incurred
further and additional out-of-pocket expenses defending the *LaCourte Action*.

21.    In April, 2011, Plaintiff retained counsel to assist his defense in the *LaCourte
Action*, which included obtaining records maintained by NCO and American Express concerning
the false debt that was the subject to the *LaCourte Action*.

22.    Even after Plaintiff filed his answer in the *LaCourt Action* disputing the alleged
debt, and after counsel appeared for Plaintiff in the *LaCourt Action*, NCO and/or Foster &
Garbus, continued to directly contact Plaintiff for the purpose of collecting the false debt.

23.    After the *LaCourte Action* was pending for seventeen months, on July 27, 2012,
the parties to the *LaCourte Action* executed a Stipulation Discontinuing Action With Prejudice.
It was admitted and conceded in that Stipulation by Foster & Garbus, and indirectly by NCO,

that: "the debt claimed in Plaintiff's [American Express'] Complaint is not owed by Defendant [James LaCourte] and was settled and paid,...."

24.     Consistent with its policies and procedures NCO was orchestrating the *LaCourte Action* and retained Foster & Garbus to abuse the New York state court system to collect a knowingly false debt from Plaintiff. NCO's policy and procedure manuals confirm its involvement and control over lawsuits filed against Class members. An NCO document styled *Attorney Firm SOP v.2.1* admonishes its retained law firms to not communicate with the creditors, even though most are the named plaintiffs in the filed lawsuits. That document states:

> NCO will interact directly with the Client. In some instances, attorneys may interact directly with the Client only after a request is made through NCO and the Client approves. **Only in urgent situations**, the firm, and a Client may makecontact providing that NCO has also been informed of the situation. If a Client initiates contact with an Attorney Firm directly, the firm is responsible, for the purposes of inventory control and tracking, to notify NCO of the communication.
>
> In essence, the Attorney Firm's first point of contact is NCO. All statements, notices, information, etc. will go through NCO.

(Emphasis in original).

25.     NCO authorization of the lawsuit against Plaintiff LaCourte by Foster & Garbus was done without <u>first</u> obtaining the "media" concerning his alleged debt. An NCO document styled *AmEx Attorney Suit Workflow*, states: "4) The attorney firm for filing suit in many jurisdictions will require supporting documentation (Media) from NCO." Neither NCO nor Foster & Garbus were in possession of the media for Plaintiffs' account prior to filing their lawsuit against him. Other NCO documents prohibit its retained attorney network law firms, including Foster & Garbus, from obtaining the media to help substantiate the veracity of a lawsuit. A NCO document styled *Attorney Firm SOP v.2.1* states at Section 4.3.5: "**Do not**

routinely request media. Request media via the firm's appropriate Attorney Representative only if a dispute arises or if the Court requires media for a default judgment entry." (Emphasis in original). On information and believe, the same policies and procedures are used when lawsuits are filed against thousands of other Class members.

26. Moreover, in the Form 10-K filed with the Securities and Exchange Commission for the fiscal year ended December 31, 2010, at page 6, NCO represents that it operates "Attorney Network Services" through which NCO "coordinate[s] and implement[s] legal collection solutions undertaken on behalf of our clients through the management of nationwide legal resources specializing in collection litigation. Our collection support staff manages the attorney relationships and facilitates the transfer of necessary documentation."

27. Plaintiff LaCourte is not the only consumer who has been sued in court for debt which is not owed as a result of his or her dealings with NCO. Tens of thousands of consumers have been sued in court nationwide as a result of NCO's efforts, performed at the behest and under the control of Chase and One Equity Partners, to turn questionable and unverified consumer debt or collection accounts into enforceable court judgments, regardless of whether the consumer actually owes the alleged underlying debt, in whole or in part.

28. Indeed, in February 2012, the Attorneys General of nineteen (19) states[1] entered into a settlement, following an investigation, with debt collector NCO Financial Systems, Inc. to resolve allegations of deceptive and unfair debt collection practices, including allegations that consumers were forced to pay NCO Financial Systems, Inc. for debts which they did not owe.

---

[1] The states which were part of the February 2012 settlement with NCO Financial Systems, Inc. were: Alaska, Arkansas, Idaho, Illinois, Iowa, Kentucky, Louisiana, Michigan, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Ohio, Oregon, Rhode Island,

Pursuant to this settlement, NCO Financial Systems, Inc. agreed to pay $575,000 to the 19 states for consumer protection enforcement efforts and an additional $50,000 for each participating state to refund consumers with valid claims. New York State was not part of this settlement.

29. Consented judgments or Assurances of Discontinuance entered into by NCO Financial Systems, Inc. ("NCOF") with the Settling Attorneys General expressly did not release any consumer claims or causes of action. For example, the Assurance of Voluntary Compliance executed by the State of Ohio and NCOF (the "Ohio AVC") provides that: "Nothing contained herein shall be construed to waive any individual right of action by a Consumer or any action by a local, state, federal, or other governmental entity."

30. The Attorneys' Generals' investigation found NCOF to have violated the FDCPA, FCRA and state consumer protection laws, and succeeded in enjoining NCOF's violations in their respective states. The Ohio AVC lists those violations and enjoined acts, which are incorporated in this Complaint acts and practices violating Plaintiff and/or the Class:

6.2 Compliance with Specific Laws. Through this Assurance, NCOF shall not:

a. Violate the FDCPA, 15 U.S.C. §1692 et seq.;

b. Violate the FCRA, 15 U.S.C. §1681 et seq.;

c. Communicate that Consumers owe Debts when communicating with any person other than the Consumers for the purposes of acquiring location information, in violation of the FDCPA, 15 U.S.C. §1692b(2);

d. Communicate with persons other than the Consumer more than once, when not requested to do so by such person, and when NCOF does not reasonably believe that the earlier response of such person was erroneous or incomplete and that such person now has correct or complete location information, in violation of the FDCPA, 15 U.S.C. §1692b(3);

South Carolina, Vermont, and Wisconsin.

10

e. Communicate with Consumers in connection with the collection of Debts at times or places NCOF knows or should know to be inconvenient to the Consumers, including during inconvenient hours, in violation of the FDCPA, 15 U.S.C. §1692c(a)(1);

f. Communicate with Consumers in connection with the collection of Debts, without the prior consent of the Consumers, after knowing that the Consumers were represented by attorneys with respect to the alleged Debts, in violation of the FDCPA, 15 U.S.C. §1692c(a)(2);

g. Communicate with Consumers in connection with the collection of Debts at the Consumers' places of employment when NCOF knows or should know that the Consumers' employers prohibit the Consumers from receiving such communications, in violation of the FDCPA, 15 U.S.C. §1692c(a)(3);

h. Communicate with Consumers in connection with the collections of Debts, except as otherwise provided by law, after being notified in writing that the Consumers refuse to pay the Debts or that the Consumers wish NCOF to cease further communications with the Consumers, in violation of the FDCPA, 15 U.S.C. §1692c(c);

i. Engage in conduct the natural consequence of which was to harass, oppress, or abuse persons in connection with the collection of a Debt, in violation of the FDCPA, 15 U .S.C. §1692d;

j. Use obscene or profane language in connection with the collection of Debts, in violation of the FDCPA, 15 U.S.C. §1692d(2);

k. Place multiple telephone calls within a short period of time to Consumers for purposes of annoying or harassing Consumers at the called numbers, in violation of the FDCPA, 15 U.S.C. §1692d(5);

l. Attempt to collect alleged Debts by telephone without providing the meaningful disclosure of the caller's identity, in violation of the FDCPA, 15 U.S.C. §1692d(6);

m. Use false or misleading representations to collect or attempt to collect Debts or to obtain Location Information, in violation of the FDCPA, 15 U.S.C. §1692e;

n. Falsely represent the character, amount, or legal status of Debts or services rendered or compensation which may be lawfully received by Debt Collectors for the collection of Debts, in violation of the FDCPA, 15 U.S.C. §1692e(2)(A)(B);

o. Represent or imply to Consumers that nonpayment of Debts will result in the

arrest or imprisonment of the Consumers, or the seizure, garnishment, attachment, or sale of any of the Consumers' property or wages when there is no legal authority or intention to do so, in violation of the FDCPA, 15 U.S.C. §1692e(4);

p. Threaten to take legal actions when there is no legal authority or intention to do so, in violation of the FDCPA, 15 U.S.C. §1692e(5);

q. Use any false representation or deceptive means to collect or attempt to collect any Debt or to obtain information concerning a Consumer, in violation of the FDCPA, 15 U.S.C. §1692e(10);

r. Use unfair or unconscionable means to collect or attempt to collect Debts, in violation of the FDCPA, 15 U.S.C. §1692f;

s. Collect or attempt to collect amounts (including interest, fees, charges, or expenses incidental to the principal obligation) that were not expressly authorized by the agreements creating the Debts or permitted by law, in violation of the FDCPA, 15 U.S.C. §1692f(1);

t. Take or threaten to take nonjudicial actions against Consumers' real or personal properties or wages when there is no legal authority or intention to do so, in violation of the FDCPA, 15 U.S.C. §1692f(6);

u. Fail to provide written notices to Consumers, within five days after initial telephone contact, that contained the following information: the amount of the Debt; the name of the Creditor; a statement that unless the Consumer disputes the validity of the Debt within thirty days NCOF will assume the Debt is valid; the process by which the Consumer may request verification of a Debt; and a statement that upon the Consumer's written request within thirty days, NCOF would provide the name of the original Creditor, if different from the current Creditor, in violation of the FDCPA, 15 U.S.C. § 1692g(a);

v. Fail to cease collection activities upon the receipt of written notifications from Consumers of disputes, or requests for the names of the original Creditors or for verification of the Debts alleged to be owed, until the NCOF mails verifications or the debts to the Consumers, in violation of the FDCPA, 15 U.S.C. §1692g(b);

w. Attempt to collect on Debts that are not owed by the Consumers contacted by the NCOF;

x. Fail to remove telephone numbers from collection account records and continue to place telephone calls to those numbers after being informed that the person from whom NCOF sought to collect the Debts cannot be reached at the numbers called;

y. Communicate with third parties more than once after the third parties provide NCOF with Location Information or indicate that they do not have the Location Information being sought, unless NCOF has a reasonable belief that the earlier response of such person was erroneous or incomplete and that such person now has correct or complete Location Information, pursuant to FDCPA, 15 U.S.C. § 1692b(3);

z. Except as permitted by law, communicate with or divulge information to third parties, without the prior consent of the Consumers, regarding alleged Debts owed by Consumers in an effort to embarrass or persuade the Consumers to pay the Debts;

aa. Fail to inform Consumers, upon receiving oral requests for verification of Debts, that requests to verify Debts must be made in writing, or failing or refusing to provide Consumers with the address to where the written requests must be mailed, or both;

bb. Collect or attempt to collect on settled Debts;

cc. Fail to honor or confirm settlement agreements in writing with Consumers and continue to attempt to collect additional amounts or the full amount of the Debts allegedly owed;

dd. Withdraw money from Consumers' bank accounts, on dates or in dollar amounts, not authorized by Consumers;

ee. Collect or attempt to collect on Debts that have been discharged in bankruptcy;

ff. Collect or attempt to collect on Debts when the Consumer has notified NCOF that they are the victim of identity theft, until NCOF takes the appropriate steps under applicable state law to determine that the Consumer is responsible for the specific Debt in question.

**Debt Collection Alchemy:**
**Turning Questionable Collection Accounts Into Court Enforced Judgments**

31.     There has been a recent explosion in the buying and selling of consumer debt. For instance, at the beginning of 2000, Chase recouped $130 million a year from bad consumer debt. By 2009, Chase's recoveries on consumer credit card debt alone exceeded $1.2 billion.

From 2009 to 2011, Chase charged off more than $20 billion in consumer credit card accounts. Chase's recovery of, and profit from, consumer debt is accomplished through its subsidiary, NCO. *See* "OCC Probing JPMorgan Chase Credit Card Collections", by Jeff Horowitz, <u>American Banker,</u> March 12, 2012.

32.     When consumer credit card accounts and other consumer loans go past due, they become "collection accounts." In order to get the collection accounts off its balance sheet, the original creditor may sell the consumer collection accounts to debt buyers who pay pennies on the dollar for credit card and other consumer debt. Debt buyers may seek to collect on the debts (where even relatively meager collections can generate handsome profits), or resell the debt portfolios to another debt buyer. It is not uncommon for debts to be bought and sold numerous times over. There is even an active market for debts that are past the statute of limitations and for debts that previously have been discharged in bankruptcy.

33.     A typical portfolio of debts contains, for each account listed in the portfolio, only the following information: the consumer's name, Social Security number, last known address and telephone number, the account number, charge-off date, date and amount of last payment, and alleged amount owed. This information is transmitted to the debt buyer electronically in the form of a spreadsheet and is often referred to as "media." The debt buyer most commonly does not purchase or obtain the actual documents which would show a debt owed by the consumer to the original creditor, such as a contract and any amendments thereto, account statements, payment history, customer service records, or customer dispute records. Often, purchase and sales agreements provide that the debt buyer may never obtain any documentation for any debts in the portfolio, *i.e.*, a "buyer beware" warning. In addition, each time a debt is resold, it

becomes less likely that the purchaser will be able to obtain actual documentation of the alleged debt. As a result, most debt buyers have significant difficulty substantiating their claims. This has been widely recognized as a problem for the industry with an adverse impact on consumers. *See, e.g.*, Federal Trade Commission, *Collecting Consumer Debts: The Challenges of Change* (2009).

34.     Increasingly, debt buyers are commencing debt collection lawsuits in order to collect from consumers. Under New York law, a debt buyer bears the proof in legal actions and must submit admissible evidence demonstrating that the debt buyer is the rightful owner of the account and that the defendant consumer actually owes the debt in the precise amount claimed. *See, e.g., Citibank v. Martin*, 807 N.Y.S. 2d 284 (Civ. Ct. N.Y. County 2005).    Debt buyers, however, generally do not obtain account documentation prior to commencing a lawsuit against a consumer for debt collection. Instead, debt buyers bring lawsuits based on the skeletal electronic "media", or less.    Furthermore, because purchase and sale agreements severely restrict or eliminate debt buyers' ability to obtain documentation of the debts from the original creditor, debt buyers are unable to obtain knowledge or evidence of the alleged consumer debt. Because of the high rate of default by consumer defendants in debt collection lawsuits, however, debt buyers are rarely required to prove their allegations through actual evidence of the alleged underlying consumer debt. Indeed, consumers appear to defend themselves in approximately only 10% of the debt collection cases brought in the New York Civil Court, and debt buyers obtain default judgments in the vast majority of debt collection lawsuits

35.     Consumer collection accounts which have been turned into enforceable court judgments through debt collection lawsuits command a much higher value in the debt market

than collection accounts which haven not been reduced to a judgment. This is because once the collection account has been reduced to a court judgment, the owner of the judgment can use strong armed post-judgment collection remedies against the consumer, which include wage garnishment, attachment of bank accounts, and asset seizure. Thus, in the debt market, a portfolio of "judgment accounts" is worth significantly more than a portfolio of "collection accounts."

36. The least expensive and quickest type of judgment to obtain is the default judgment. Generally, a creditor needs only the following to obtain a default judgment against the consumer: (1) a form complaint; (2) an affidavit by an employee of the creditor attesting to the accuracy of the amount owed; (3) proof of service at the consumers last known address; and (2) a form default order for the court's execution.

37. As *The New York Times* reported on August 12, 2012, "many of the [consumer debt collection] lawsuits rely on erroneous documents, incomplete records and generic testimony from witnesses, according to judges who oversee the cases." *See* "Problems Riddle Moves to Collect Credit Card Debt," by Jessica Silver-Greenberg, *The New York Times*, August 12, 2012. The Honorable Noach Dear, a civil court judge in Brooklyn, New York stated, "I would say that roughly 90 percent of the credit card lawsuits are flawed and can't prove the person owes the debt." *Id.* As *The New York Times* reported:

> Interviews with dozens of state judges, regulators and lawyers, however, indicated that such flaws are increasingly common in credit card suits. In certain instances, lenders are trying to collect money from consumers who have already paid their bills. . . .
> The problem, according to judges, is that credit card companies are not always following the proper legal procedures, even when they have the right to collect money. Certain cases hinge on mass-produced documents because lenders do not provide proof off

16

outstanding debts, like the original contract or payment history.

*Id.*

38.     According to the Federal Trade Commission ("FTC"), "[w]hen accounts are transferred to debt collectors, the accompanying information often is so deficient that the collectors seek payment from the wrong consumer or the wrong account from the correct consumer.   FTC, "Collecting Consumer Debts: The Challenges of Change" (2009) at 22, available at http://www.ftc.gov/bcp/workshopts/debtcollection/dcwr.pdf.   A recent review of the consumer litigation system by the FTC found that "credit card issuers and other companies were basing some lawsuits on incomplete or false paperwork."   *See* "Problems Riddle Moves to Collect Credit Card Debt," by Jessica Silver-Greenberg, *The New York Times*, August 12, 2012. Tom Pahl, the assistant director of the FTC's Division of Fnancial Practices stated, "Our concerns center on the fact that debt collection lawsuits are a pure volume business. . . . The documentation is very bare bones." *Id.*

39.     *The New York Times* also reported that:

> The errors in credit card suits often go undetected, according to the judges.   Unlike in foreclosures, the borrowers typically do not show up in court to defend themselves.  As a result, an estimated 95 percent of lawsuits result in default judgments in favor of lenders.   With a default judgment, credit card companies can garnish a consumer's wages or freeze bank accounts to get their money back. . . .
>
> Many judges said that their hands are tied.   Unless a consumer shows up to contest a lawsuit, the judges cannot question the banks or comb through the lawsuits to root our suspicious documents. Instead, they are generally required to issue a summary judgment, in essence an automatic win for the bank.

"Problems Riddle Moves to Collect Credit Card Debt," by Jessica Silver-Greenberg, *The New*

*York Times*, August 12, 2012.

40. Thus, the valuation of a particular debt portfolio is not based on the legitimacy of the debt itself, but on the likelihood that a debtor will succumb to the pressure exerted by the threat or entry of a court judgment. *See* FTC, Challenges of Change at 20. The odds are stacked against the alleged consumer debtor. *See* Claudia Wilner *et al.*, "Debt Deception: How Debt Buyers Abuse The System To Prey On Lower-Income New Yorkers, Neighborhood Econ. Dev. Advocacy Project (2010), available at www.nedap.org/pressroom/documents/DEBT_DECEPTION_FINAL_WEB.pdf (noting that 95% of 457,322 lawsuits filed by twenty-six debt buyers against people residing in low- or moderate-income neighborhoods ended in default judgments, and not a single consumer in the study was represented by counsel.); Jessica Silver-Greenberg, "Boom in Debt Buying Fuels Another Boom- In Lawsuits," The Wall Street Journal, Nov. 28, 2010 (reporting that industry estimates 94% of collections end in default and that "[t]he majority of borrowers don't have a lawyer, some don't know they are even being sued, and others don't appear in court, say judges.").

41. A reasonable consumer may feel forced to pay an invalid debt, rather than face the consequences of having a judgment entered against him or her:

> [T]he judgment will impose costs on the consumer by damaging the consumer's credit rating . . . [which] does more than merely raise the consumer's cost of credit. A damages credit score can make it difficult to rent an apartment, find a job, or even purchase automobile insurance. . . . credit reports typically do not record the filing of the lawsuit, but they do record judgments. Therefore, a civil filing serves as a credible threat to inflict harm on the [consumer] defendant and may induce the [consumer] defendant to pay.

Richard Hayes, Broke But Not Bankrupt: Consumer Debt Collection In State Courts, 60 Fla. L. Rev. 1, 20 (2008).

42.    As a result, debt collectors have been empowered to flood the court system with actions to collect on consumer debt, including debt which is already paid-off or time barred. FTC, Challenges of Change at 24. *See also*, Judicial Counsel of Cal., *Trial Court Caseload Increases to Over 10 Million Filings, Data Points* 1 (2010) (reporting "[a]n estimated 96,000 consumer debt-collection cases were filed in 2009 in Alameda, Contra Costa and San Francisco Counties alone, up from 53,665 in 2007); Urban Justice Ctr., *Debt Weight: The Consumer Credit Crisis In New York City and Its Impact on the Working Poor* 1 (2007) (annual filing of debt collection cases in New York City increased by more than 60% between 2002 and 2007).

43.    Indeed, in 2009, the FTC received 37,052 complaints from consumers stating that they had been targeted by debt collectors who were trying to collect debts that were not owed, in amounts over what was owed, or which had been discharged in bankruptcy. *See* Federal Trade Commission, Annual Report 2012: Fair Debt Collection Practices Act,. P.6-10, posted on line at www.ftc.gov/os/2010/P104802fdcpa2010annrpt.pdf. The FTC noted that its 2009 complaint data, however, "may understate the extent to which consumers have concerns about the practice of debt collectors" because consumers generally may not be aware of the FTC's enforcement role or may only file complaints with collectors, creditors or other enforcement agencies. *Id.* at 2.

44.    The 2009 FTC Report's conclusions are apparent from the activities of debt collectors like Chase the other Defendants in this action owned and controlled by Chase. For example, a complaint filed by a former Chase and NCO manager in Texas state court, removed

to federal court, styled *Almonte v. JP Morgan Chase Bank, N.A.*, alleged that Chase required its employees to bundle and sell for further debt collection the consumer debts that did not have adequate documentation, debts that listed incorrect balances, debt subject to bankruptcy proceedings and debts claimed to be reduced to judgment, but which were missing the judgments or otherwise defective. The federal court denied a motion by Chase to dismiss that lawsuit, which thereafter settled.

**NCO's Litigation Factory Knowingly and Recklessly**
**Targets Consumers Who Do Not Owe The Alleged Debt**

45.     Defendant NCO is the largest debt collector in the United States with an annual revenue of $1.2 billion in 2011. NCO is also a debt buyer. NCO is an indirect majority owned subsidiary of Chase. At all relevant times, the officers at NCO were cross-pollinated with former Chase executives and NCO's operations were almost exclusively funded by Chase through a series of public offerings underwritten by Chase and subscribed to primarily by Chase. Specific debt sales between Chase and NCO were financed by loans made by Chase. Chase employees, including Chase attorneys, oversee and direct NCO's debt collection operations. Moreover, as set forth in the NCO Form 10-K filed with the SEC for the year ending December 31, 2010, at page 20, NCO states that One Equity Partners, the private equity arm of Chase, controls NCO's affairs and policies. "We are controlled by an investor group led by One Equity Partners, a private equity firm, and its affiliates" who "control the election of our [NCO's] directors and thereby have the power to control our [NCO's] affairs and policies, including the appointment of management." NCO also pays One Equity Partners $3 million a year for "management services."

46.     In the pursuit of turning questionable collection accounts into court enforced

judgments, Defendant NCO, at the direction and with the assistance of Defendant Chase, has flooded the courts with mass-produced lawsuits. NCO employs a network of at least 150 debt collection affiliate law firms nationwide to commence the debt collection lawsuits on behalf of NCO and/or the credit card issuers against consumers. NCO applies three key performance measures for affiliate law firms: (1) the speed at which consumer collection accounts are reduced to judgment accounts; (2) the number of consumer collection accounts reduced to judgment accounts; and (3) the amount of money collected on each judgment account. NCO's continued placement of the litigation accounts with an affiliate law firm depends on the law firm's ability to meet the three performance targets of speed, quantity, and amount of money recovered. As a result, accuracy and legitimacy are sacrificed.

47. NCO takes a "factory approach" to litigation by filing a high volume of lawsuits filed by Defendant Does 1 through 150 Law Firm Affiliates nationwide against alleged consumer debtors based on scant and unverified information. NCO uses an Attorney Network Standard Operating Procedure manual which all Defendant Does 1 through 150 Law Firm Affiliates in the NCO network must follow when retained by NCO for the filing of debt collection lawsuits against consumers. The Attorney Network Standard Operating Procedure applies to all lawsuits commenced on behalf of NCO's clients including, but not limited to, American Express, Discover Card, Capitol One, Applied Card, Bank of America, Ford Motor Credit, CitiFinancial, Chevy Chase, Direct TV, First Marblehead, and NCOP.

48. NCO maintains an eRecoverEase ("eRE") website for the purpose of orchestrating and managing the debt collection lawsuits brought by the Defendant Does 1 through 150 Law Firm Affiliates nationwide. New account placements, suit/collection updates,

remittance and cost and payment reimbursement information is communicated between the Defendant Does 1 through 150 Law Firm Affiliates and NCO via the eRE website.

49.    According to NCO's Attorney Network Standard Operating Procedure, NCO expects that all accounts forwarded to the Defendant Does 1 through 150 Law Firm Affiliates will result in a suit decision, *i.e.*, a default judgment against the consumer, within 30-60 days from the date of placement with the affiliated law firm.  The Defendant Does 1 through 150 Law Firm Affiliates work on contingency for NCO and NCO pays the Defendant Does 1 through 150 Law Firm Affiliates based on the amounts recovered from consumers.  Indeed, it is NCO, and not NCO's clients, which pay commissions to the Defendant Does 1 through 150 Law Firm Affiliates based on the law firm's performance.  NCO sets strict percentages for settlement approval for each account placed with the Defendant Does 1 through 150 Law Firm Affiliates.  If the Defendant Does 1 through 150 Law Firm Affiliates settle an account for less than the strict percentages set by NCO on behalf of NCO's clients, including, but not limited to American Express, Bank of America, Capitol One, Discovery, the Defendant Does 1 through 150 Law Firm Affiliates are charged the difference by NCO.  An exception is made for accounts which were in bankruptcy: NCO allows the Defendant Does 1 through 150 Law Firm Affiliates to use their own judgment when deciding whether to accept or decline settlement offers from consumers on accounts in bankruptcy, accounts which never should have been placed for litigation in the first instance.

50.    NCO's Attorney Network Standard Operating Procedure provides that NCO, and not the Defendant Does 1 through 150 Law Firm Affiliates, will maintain all contact with the client, or underlying creditor.  In fact, NCO prohibits the Defendant Does 1 through 150 Law

Firm Affiliates from initiating any contact with the creditor client (even when the creditor is named plaintiff in a lawsuit against a debtor) and it is NCO, and not the underlying creditor, which is the primary contact for the Defendant Does 1 through 150 Law Firm Affiliates.

51. NCO requires that the Defendant Does 1 through 150 Law Firm Affiliates follow all work standards as specifically dictated by NCO. NCO instructs the Defendant Does 1 through 150 Law Firm Affiliates never to request even the "media", *i.e.*, the skeletal electronic file which is in most cases the only information which NCO possesses, regarding the alleged underlying consumer debt, unless a dispute arises or the Court requires media for entry of a default judgment.

52. Tens of millions of consumer accounts have been thrown into this litigation factory. The volume and pace of debt collection lawsuits has outstripped the record-keeping capabilities of the lawsuit originators. Routinely, these lawsuits target consumers who have repaid their debts or otherwise do not owe the debts alleged, like Plaintiff. NCO forwards only the electronic consumer data to its affiliate law firms, including Foster & Garbus and Defendant Does 1 through 150 Law Firm Affiliates. NCO, moreover, will not pay an affiliate law firm to perform any pre-filing verification to determine the accuracy of the electronic consumer data.

53. Defendants have failed to invest in the infrastructure necessary to keep track of vital information about the consumer collection accounts which are passed between debt buyers, debt collectors, and lawyers, and which have become the subject of said debt collection lawsuits filed en masse. Rather than establish reliable internal controls, Defendants intentionally obfuscate the consumer loan history. This makes it difficult for debt buyers, debt collectors and affiliate law firms to verify the accuracy of the underlying debt allegedly owed by the consumer.

Defendants knowingly fail to maintain the integrity of the consumer's loan information. Defendants willingly fail to ensure the accuracy of the representations which they make to affiliate law firms, consumers and the courts about the underlying debt, if any, which exists and which is the subject of the collection lawsuits brought against consumers.

54.     "When accounts are transferred to debt collectors, the accompanying information often is so deficient that the collectors seek payment from the wrong consumer or demand the wrong amount from the correct consumer," and FTC workshop found.   See "Collecting Consumer Debts: The Challenges of Change," a Workshop Report from the Federal Trade Commission, February 2009, p. 22.   A debt buyer commonly gets "only a computerized summary of the creditor's business records when it purchases a portfolio." *Id.* As a result, debt buyers pursuing a claim against a consumer in court rarely have the necessary underlying documents, such as the credit card application which is the source of the alleged claim, a copy of a signed contract, charge slips, records of payments or disputes or a written assignment of the claim, which are necessary to verify the alleged debt. *See* Fair Debt Collection by National Consumer Law Center, 2008, Sixth Edition, p. 9.

55.     NCO typically enters into one of two types of commercial relationships with a debt owner which result in that debt owner "on boarding" consumer credit or collection accounts to NCO's computerized collection platform.   First, NCO may act as a debt buyer and purchase title and ownership of a portfolio of consumer debt.   Second, NCO may act as the Litigation Service Provider for an original creditor or a debt owner.   Regardless which commercial relationship is entered into, NCO uses a standard "on boarding" procedure for collection accounts.   Each original creditor or debt owner sends NCO in batch form selective electronic

consumer information which NCO then uploads onto its computerized collection platform. The electronic consumer information received by NCO is intentionally scant and fails to contain any legacy information concerning the consumer's loan and payment history. NCO notifies the consumer of the collection account transfer to NCO by a single letter sent to the consumer's last known address.

56.     Because NCO does not obtain or upload the legacy consumer loan information onto its computerized collections platform, NCO can never verify the accuracy of the limited data points in the electronic consumer information which is uploaded to the collection platform. The electronic consumer information which NCO does obtain, moreover, fails to provide critical information concerning the underlying account, such as the original loan agreement, the payment history, notices of bankruptcy filings, court ordered discharges, settlements, cease and desist orders, notice of death of consumers, and other important information that would verify whether the alleged debt was in fact valid. Neither NCO nor the original creditor perform any due diligence on the electronic consumer information before uploading it to the computerized collection platform at NCO. NCO, moreover, requires no data retention practices on behalf of the original creditor or debt owner during the uploading or "on boarding" process.

57.     NCO's computer systems are supposed to manage the process of collecting consumer debt and/or reducing that debt to a court judgment. However, NCO's computer systems are rife with known glitches which make the systems unreliable and which generate erroneous information concerning consumer collection accounts. Rather than correct these known glitches, NCO has come to rely on them to increase profits. One known material glitch with the NCO computerized collection platform is the "returned by automation" glitch, also

25

referred to as the "RBA Bug." When an affiliate law firm settles an unpaid consumer collection account, that affiliate law firm should enter a P-code for "paid in full" or "settled in full" ("SIF") into the NCO "ESE" system, which in turn, should upload the new P-code status. However, the RBA Bug prevented the P-code from being uploaded to reflect the accurate status of that particular consumer account. As a result, NCO has continued unlawful collection efforts on tens of thousands of consumer accounts, if not more, that have been properly paid or settled.

58.     Indeed, Chase manager Paschco Montoya alerted Chase and NCO employees that several systematic computer errors had been identified with respect to consumer collection accounts which had been "settled in full" or "SIF." American Express collection accounts, among others placed with NCO, had been infected with the RBA Bug. American Express was made aware of the RBA Bug and revised its contract with NCO so that NCO would pay a $10,000 fine to American Express for every collection account that originated from American Express and which "caught" the RBA Bug. American Express, however, did not discontinue doing business with NCO despite its awareness of the RBA Bug.

59.     NCO, moreover, relies on the P-code to provide updated information to credit bureaus concerning the status of the consumers' loans. As a result, and in light of NCO's knowledge of, and failure to remedy, the RBA Bug which prevented the P-code from being uploaded to individual consumer collection accounts, NCO knowingly provided credit bureaus with false and erroneous information about consumers' loan status.

60.     NCO drafted and revised contracts with American Express Company, Citigroup, Inc., Bank of America Corporation, and Capital One Financial Corporation in order to carve out liability for specific known compliance problems.

61.     Every month, Chase and NCO managers would meet with employees of certain original creditors and debt owners, including American Express, Citigroup, Bank of America and Capital One. Through these monthly meetings, it came to be known at Chase and NCO that all of these companies were sending inaccurate consumer collection account information to NCO as part of the electronic consumer files which were uploaded onto NCO's computerized collection platform. Moreover, these companies routinely pressured NCO to file more debt collection lawsuits faster in order to turn collection accounts into the more valuable judgment accounts. NCO thus was and is in charge of the debt collection lawsuits brought on behalf of these original creditors, even where the lawsuits are commenced in the name of the original creditor.

62.     NCO's debt collection lawsuit factory, which seeks to turn non-existent or invalid consumer debt into collectible judgments, is also dependent on the "robo-signing" of affidavits by employees of the original creditor who have no actual knowledge of the underlying debt, the amount thereof, and whether the consumer actually owes the alleged debt. This practice is common and well known in the debt collection lawsuit industry. See *Vassalle v. Midland Funding, LLC*, No. 3:11-CV-00096, 2011 WL 3557045 (N.D. Ohio Aug. 12, 2011)(settling class action with 1.4 million consumers involving allegations of "robo-signing" of affidavits falsely claiming personal knowledge concerning the underlying debt for use in collection lawsuits).

63.     NCO provides "signature ready" affidavits to the Defendant Does 1- 150 Law Firm Affiliates and instructs the Defendant Does 1- 150 Law Firm Affiliates to use these affidavits. NCO has developed an electronic affidavit generation system. Each day, the NCO computer system generates thousands of affidavits. NCO sends these affidavits back to the original creditor for signature, and then the executed affidavits are returned to NCO. NCO then

forwards the affidavits to the Defendant Does 1- 150 Law Firm Affiliates.

64.     The affidavits are signed by a small handful of persons who have little or no knowledge of the underlying debt. For example, just three employees at the Chase offices in San Antonio, Texas, Ruben Alcarz, Deborah Hicks and Kevin Fletcher, were predominantly responsible for signing the majority of affidavits used in debt collection litigation against Chase debtors nationwide. All three Chase employees had the job title of "Attorney Liaisons." Collection affidavits require the signer to be familiar with the bank's pertinent records. However, these three employees rarely, if ever, reviewed the "books and records" concerning the consumers' collection accounts. *See* "OCC Probing JPMorgan Chase Credit Card Collections," American Banker, by Jeff Horowitz, March 12, 2012. Instead, the employees routinely signed stacks of affidavits on airplane flights and in meetings and considered the task akin to busy work. *Id.* Howard Hardin, another former Chase employee, reported to the American Banker that "We did not verify a single one" of the affidavits which attested to the alleged amounts of the underlying consumer debts. Hardin stated, "We were told [by superiors], 'We're in a hurry. Go ahead and sign them.'" *Id.*

65.     Defendants thus know, or reasonably should know and intentionally and recklessly fail to know, that consumer debt which they have sought, and continue to seek, to collect upon and ultimately, turn into judgments through collection lawsuits brought against consumers, is debt which is not owed by the consumer, either in whole or in part.

## CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of persons against whom debt collection activities, including, but

28

not limited to, lawsuits, have been or are being taken and/or orchestrated by Defendants and their

affiliates in an effort to collect on debt which Defendants knew were not owed or have failed to

verify is actually owed, either in whole or in part, by the consumer (the "Class"), Plaintiff also

brings this action on behalf of a Subclass of persons against whom Defendants have taken the

following actions in violation of the FDCPA:

(a). Communicating with consumers in connection with the collection of debts at times or places Defendants know or should know to be inconvenient to Consumers, including during inconvenient hours;

(b). Communicating with consumers in connection with the collection of debts, without the prior consent of consumers, after knowing that the consumers were represented by attorneys with respect to the alleged Debts;

(c). Communicating with consumers in connection with the collections of debts, except as otherwise provided by law, after being notified in writing that the consumers refuse to pay the debts or that consumers wish Defendants to cease further communications with the consumers;

(d). Placing multiple telephone calls within a short period of time to consumers for purposes of annoying or harassing consumers at the called numbers;

(e). Attempting to collect alleged debts by telephone without providing the meaningful disclosure of the caller's identity; and/or

(f). Collecting or attempting to collect amounts (including interest, fees, charges, or expenses incidental to the principal obligation) that were not expressly authorized by the agreements creating the Debts or permitted by law, in violation of the FDCPA, 15 U.S.C. §1692f(1).

67. Plaintiff also brings this action on behalf of a Subclass of persons on behalf of

whom Defendants have furnished, or failed to correct information they have furnished or know

to be furnished, to consumer reporting agencies that is false, deceptive and/or misleading.

68. Plaintiff does not know the exact size or identifies of the proposed class, since

such information is in the exclusive control of Defendants. Plaintiff believes that the class

encompasses many hundreds to thousands of individuals whose identities can be readily ascertained from Defendants' books and records.

69.    Common question of law and fact raised in this action include the following:

(a)    Whether Defendants have orchestrated debt collection efforts which seek to collect on consumer debt which Defendants know, or reasonably should know and fail to know, is debt which is not owed, in whole or in part, by the consumer, including (1) orchestrating and commencing legal actions against consumers to collect on debt which is not owed, in whole or in part; and (2) mass generating and robo-signing of affidavits for use in said debt collection lawsuit.

(b)    Whether Defendants violated the FDCPA;

(c)    Whether, on behalf of a subclass of persons in New York State, Defendants violated New York General Business Law § 349;

(d)    Whether Defendants violated the Fair Credit Reporting Act;

(e)    Whether Defendants violated RICO; and

(f)    Whether Plaintiff and the other members of the Class are entitled to damages, restitution, declaratory relief and/or injunctive relief as a result of Defendants' conduct, and the proper measure of damages and other relief.

70.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained able counsel with extensive experience in deceptive consumer practices, including violations of the FDCPA, the FCRA, and GBL § 349, as well as in class action litigation. The interests of Plaintiff are coincident with, and not antagonistic to, the interests of the other Class members.

71. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

72. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for defendant.

73. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class individually to redress the wrongs done to them. The Class is readily definable, and prosecution of this action as a class action will eliminate the possibility of repetitious litigation. Plaintiff will encounter no difficulty in managing this action as a class action.

## FRAUDLENT CONCEALMENT AND EQUITABLE TOLLING

74. Defendants have engaged in deceptive, misleading, and fraudulent efforts to conceal the true nature of their unlawful conduct from Plaintiff, the Classes and Subclasses through acts of omission and misrepresentations. Defendants have intended to and have, in fact, accomplished their concealment through misrepresentations and omissions, as described herein.

75. As a result and proximate cause of Defendants' concealment and because Defendants represent or represented that debts are owed, or owed in the amounts represented, Class and Subclass members were likely to be reasonably unaware of Defendants' unlawful acts and the claims alleged in this action.

76.     A reasonably diligent consumer, including members of the Class and Subclasses, could not have learned of their claims alleged in this action, or all the material events giving rise to their claims in this action, prior to the filing of this lawsuit. The claims alleged in this action have been tolled since that time.

77.     Class and Subclass members' lack of knowledge as to the existence of their claims against Defendants and was not due to any fault or lack of reasonable diligence on their part, but rather due entirely or substantially to the acts of Defendants designed to conceal and hide the true nature of their unlawful conduct. To the contrary, Plaintiff has been diligent in bringing his claims in this action, both individually and on behalf of the Class and Subclasses.

78.     Class and Subclass members' claims alleged in this action were tolled, equitably and/or as a result of Defendants' fraudulent concealment, at least until the filing of this action. To the extent it is asserted by Defendants that any of Plaintiff's individual claims are untimely, Plaintiff's claims to the extent not timely were tolled, equitably and/or as a result of Defendants' fraudulent concealment.

## FIRST CAUSE OF ACTION

### VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT
### (ALL DEFENDANTS)

79.    Plaintiff restates, realleges and incorporates by reference the foregoing paragraphs.

80.    Plaintiff and the other members of the Class are "consumers" as that term is defined in 15 U.S.C. § 1692a(3).

81.    Defendants are each "debt collectors" as that term is defined in 15 U.S.C. §1692a(6) insofar as Defendants and their employees, agents and representatives collect and attempt to collect false or invalid debts from consumers.

82.    The FDCPA, 15 U.S.C. §1692e, provides:

"A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section . . . .

2) The false representation of – (A) the character, amount, or legal status of any debt; . . .

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. . . .

(13) The false representation or implication that documents are legal process.

83.    The FDCPA, 15 USC §1692f, provides:

"A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The collection of any amount (including any interest, fee, charge, or

33

expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."

84.    Defendants have violated 15 USC §§16929(e) and (f) by using false representations and deceptive and unconscionable means to collect or attempt to collect consumer debt for the reasons contained in the Ohio AOD, including: (a) causing lawsuits to be filed *en masse* against consumers for debt collection when Defendants know, or reasonably should know and fail to discovery, that the alleged underlying debt which is the subject of the litigation, is not valid, in whole or in part, or in the amounts sought; and (b) causing the mass production of affidavits and the robo-signing thereof for use in said lawsuits.

85.    Moreover, the Assurances of Voluntary Compliance entered into by the Attorneys General of nineteen states that settled FDPCA and FCRA violations with NCOF, including the Ohio AVC dated January 23, 2012 and attached hereto as Exhibit A, requires that NCOF cease and desist its violations of the FDCPA, 15 U.S.C. §1692, including, misleading representations to collect or attempt to collect debts, including but not limited to, the following FDCPA violations imposed by Defendants on Plaintiff, the Class and Subclasses:

Section 6.2

\*\*\*

e. Communicate with Consumers in connection with the collection of Debts at times or places NCOF knows or should know to be inconvenient to the Consumers, including during inconvenient hours, in violation of the FDCPA, 15 U.S.C. §1692c(a)(l);

f. Communicate with Consumers in connection with the collection of Debts, without the prior consent of the Consumers, after knowing that the Consumers were represented by attorneys with respect to the alleged Debts, in violation of the FDCPA, 15 U.S.C. §1692c(a)(2);

\*\*\*

h. Communicate with Consumers in connection with the collections of Debts, except as otherwise provided by law, after being notified in writing that the Consumers refuse to pay the Debts or that the Consumers wish NCOF to cease further communications with the Consumers, in violation of the FDCPA, 15 U.S.C. §1692c(c);

i. Engage in conduct the natural consequence of which was to harass, oppress, or abuse persons in connection with the collection of a Debt, in violation of the FDCPA, 15 U .S.C. §1692d;

\*\*\*

k. Place multiple telephone calls within a short period of time to Consumers for purposes of annoying or harassing Consumers at the called numbers, in violation of the FDCPA, 15 U.S.C. §1692d(5);

l. Attempt to collect alleged Debts by telephone without providing the meaningful disclosure of the caller's identity, in violation of the FDCPA, 15 U.S.C. §1692d(6);

m. Use false or misleading representations to collect or attempt to collect Debts or to obtain Location Information, in violation of the FDCPA, 15 U.S.C. §1692e;

n. Falsely represent the character, amount, or legal status of Debts or services rendered or compensation which may be lawfully received by Debt Collectors for the collection of Debts, in violation of the FDCPA, 15 U.S.C. §1692e(2)(A)(B);

o. Represent or imply to Consumers that nonpayment of Debts will result in the arrest or imprisonment of the Consumers, or the seizure, garnishment, attachment, or sale of any of the Consumers' property or wages when there is no legal authority or intention to do so, in violation of the FDCPA, 15 U.S.C. §1692e(4);

p. Threaten to take legal actions when there is no legal authority or intention to do so, in violation of the FDCPA, 15 U.S.C. §1692e(5);

q. Use any false representation or deceptive means to collect or attempt to collect any Debt or to obtain information concerning a Consumer, in violation of the FDCPA, 15 U.S.C. §1692e(10);

r. Use unfair or unconscionable means to collect or attempt to collect Debts, in violation of the FDCPA, 15 U.S.C. §1692f;

s. Collect or attempt to collect amounts (including interest, fees, charges, or expenses incidental to the principal obligation) that were not expressly authorized by the agreements creating the Debts or permitted by law, in violation of the FDCPA, 15 U.S.C. §1692f(l);

***

v. Fail to cease collection activities upon the receipt of written notifications from Consumers of disputes, or requests for the names of the original Creditors or for verification of the Debts alleged to be owed, until the NCOF mails verifications or the debts to the Consumers, in violation of the FDCPA, 15 U.S.C. §1692g(b);

***

bb. Collect or attempt to collect on settled Debts;

cc. Fail to honor or confirm settlement agreements in writing with Consumers and continue to attempt to collect additional amounts or the full amount of the Debts allegedly owed;

***

Defendants have violated and continue to violate the FDPCA, causing actual and/or statutory injuries to Plaintiff, the Class and Subclasses, in the manner found by the investigating Attorneys General, and quoted from the Ohio AVC in this Paragraph.

86.     As a result of Defendants' past and continuing violations of the FDCPA, including 15 U.S.C. §§ 1692c, 1692d, 1692e, 1692f and 1692g Plaintiff and the other members of the Class have suffered actual and statutory damages and bring claims for all available relief pursuant to 15 U.S.C. §1692k.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE FAIR CREDIT REPORTING ACT
### (ALL DEFENDANTS)

87.　Plaintiff restates, realleges and incorporates by reference the foregoing paragraphs.

88.　Plaintiff and the other members of the Class are "consumers" as that term is defined in the FCRA 28 U.S.C. §1681b(c).

89.　Defendants are furnishers of consumer information to "consumer reporting agencies" and as that term is defined in the FCRA §1681a(f).

90.　The FCRA 15 U.S.C. §1681s-2, provides, in relevant part, that furnishers of consumers' information to consumer reporting agencies must provide accurate information:

(a) Duty of Furnishers of Information to Provide Accurate Information

(1) Prohibition

> (A) *Reporting information with actual knowledge of errors.* A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate.

91.　In addition, the FCRA 15 U.S.C. §1681s-2(a)(1)(B) requires furnishers to correct and update information provided to consumer reporting agencies if the furnisher determines that the information provided is not complete or accurate and further requires the furnisher to stop providing inaccurate consumer information to credit reporting agencies.

92.　Defendants have violated the FCRA 15 U.S.C. §1681s-2 by providing information relating to consumer credit reporting agencies which Defendant know, or reasonably should know, or are reckless in not knowing, is false, and by failing to provide complete and

37

accurate information, including failing to report consumer collections accounts as "paid" or "settled" as a result of the RBA bug or otherwise, orchestrating the entry of judgments against consumers for debt which is not owed, in whole or in part, and which Defendants know or reasonably should know and fail to verify is not owed by the consumer, in whole or in part, and by failing to correct incomplete or inaccurate information which has been provided to the consumer credit reporting agencies.

93. As a result of Defendants violations of the FCRA, Plaintiff and the other members of the Class have suffered damages and bring claims for all available relief pursuant to the FCRA.

## THIRD CAUSE OF ACTION

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW SECTION 349 (ALL DEFENDANTS)

94. Plaintiff restates, realleges and incorporates by reference the foregoing paragraphs.

95. Plaintiff asserts this claim on behalf of himself and all similarly situated persons who reside in New York.

96. Defendants' acts and practices alleged herein constitute acts, uses, or employment by Defendants and their agents of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of merchandise, and with the subsequent performance, of Defendants in violation of §349 of New York's General Business Law, making deceptive and unfair acts and practices illegal. Defendants' acts and practices

alleged herein in violation of §349 include using false representations and deceptive and unconscionable means to collect or attempt to collect consumer debt by, *inter alia*,: (a) causing lawsuits to be filed en masse against consumers for debt collection when Defendants know, or reasonably should know and fail to discovery, that the alleged underlying debt which is the subject of the litigation, is not valid, in whole or in part, or in the amounts sought; (b) causing the mass production of affidavits and the robo-signing thereof for use in said lawsuits; and (c) making false representations about consumer's debt status to credit reporting agencies and failing to take corrective action concerning the inaccurate information provided to consumer credit reporting agencies.

97.    Defendants' acts and misrepresentations constitute acts, uses, or employment by defendant and its agents of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of merchandise, and with the subsequent performance, of Defendants in violation of § 349 of New York's General Business Law, making deceptive and unfair acts and practices illegal.

98.    The unfair and deceptive trade acts and practices of Defendants have directly, foreseeably, and proximately caused damages and injury to Plaintiff and the other members of the New York Sub-Class.    Plaintiffs and the Class are entitled to pursue claims against Defendants during the GBL 349 Class Period for damages, statutory damages, treble damages, exemplary damages, injunctive relief, costs and attorney's fees pursuant to GBL §349(h) to redress Defendants' violations of GBL §349(a).    Class members who were sixty-five years of

age or older at the time of Defendants' violations of GBL §349 are entitled to pursue additional claims pursuant to GBL §349-c to redress Defendants' violations of GBL §349(a) perpetrated against one or more elderly persons.

99.     In addition to pecuniary losses, Plaintiffs and the Class suffered actual harm as a result of Defendants' violations GBL §349(a), including but not limited to the annoyance, harassment, time, frustration, anger and anxiety incurred by Plaintiffs and the Class due to Defendants' violations of GBL §349. Plaintiff and the other members of the New York Sub-Class have no adequate remedy of law.

## FOURTH CAUSE OF ACTION

### VIOLATIONS OF THE RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT, 28 U.S.C. §§ 1962(C) AND (D) (ALL DEFENDANTS)

100.     Plaintiff restates, realleges and incorporates by reference the foregoing paragraphs.

101.     Plaintiff is a natural person, and as such is a "person" within the meaning of 18 U.S.C. §1961(3).

102.     Defendants are corporate entities, and as such are "persons" within the meaning of 18 U.S.C. §1961(3).

### *The Enterprise*

103.     On information and belief, Defendants are distinct groups or persons that together form an enterprise within the meaning of 18 U.S.C. § 1961(4). Each and every Defendant is employed by or associated with the enterprise.

104     The purpose of the enterprise is to collect on consumer debt, and/or to obtain

40

default judgments, through fraudulent means in order to extract money from consumers, including Plaintiff and the other members of the Class.

105. The Enterprise has for many, but no fewer than four, years been engaged in, and continues to be engaged in, activities that affect interstate commerce. Defendants' unlawful enterprise in violation of RICO has been and remains longstanding, continuous and open ended.

### Pattern of Racketeering- Mail and Wire Fraud

106. Defendants, individually and collectively, as an enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity, as described below, in violation of 18 U.S.C. § 1962(c) and (d).

107. Defendants, acting individually and as an enterprise, have devised a scheme to defraud and obtain money or property by means of false or fraudulent pretenses and representations. The scheme includes, but is not limited to, making false and deceptive representations that consumers owe an underlying debt, when Defendants know, or reasonably should know and fail to know, that the underlying debt is not owed in whole or in part, and by producing and filing fraudulent affidavits and lawsuits that claim Defendants have personal knowledge of the facts, and are in possession of documentation, evidencing that consumers owe the alleged debt, when in fact Defendants do not have personal knowledge, and do not or cannot possess the underlying documents which would evidence whether the alleged consumer debt was valid.

108. Defendants, acting individually and as part of the enterprise, have made fraudulent misrepresentations transmitted over the United States mails or wires specifically as follows, which constitute a pattern and practice of unlawful acts in violation of 18 U.S.C. §§1341

41

and 1343:

(a).    On October 18, 2010, NCO Financial Systems sent a letter to Plaintiff using the United States mails falsely representing that he owed a debt of $2,752.01;

(b).    On October 20, 2010, NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(c).    On October 27, 2010, NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(d).    On November 4, 2010, NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(e).    On November 11, 2010, NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(f).    On November 17, 2010, NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(g).    On November 24, 2010, NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(h).    On December 9, 2010, Foster & Garbus sent a letter to Plaintiff using the United States mails falsely representing that he owed a debt of $2,752.01;

(i).    On December 10, 2010, Foster & Garbus sent a letter to Plaintiff using the United States mails falsely representing that he owed a debt of $2,752.01;

(j).    On December 13, 2010, Foster & Garbus or NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(k).    On December 17, 2010, Foster & Garbus or NCO used the telephone wires to call

Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(l). On December 20, 2010, Foster & Garbus or NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(m.) On December 21, 2010, Foster & Garbus or NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(n). On December 29, 2010, Foster & Garbus or NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(o). On January 3, 2011, Foster & Garbus or NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(p). On January 4, 2011, Foster & Garbus or NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(q). On January 7, 2011, Foster & Garbus or NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(r). On January 11, 2011, Foster & Garbus or NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(s). On or about January 17, 2011, Foster & Garbus, at the direction of NCO, filed a Formal Complaint with the District Court of the State of New York, County of Suffolk, 2nd District, Babylon falsely representing that Plaintiff owed a debt of $2,752.01, plus interest, which Formal Complaint was served on Plaintiff using the United States mails;

(t). On January 18, 2011, Foster & Garbus or NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(u). On January 21, 2011, Foster & Garbus or NCO used the telephone wires to call

Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(v). On January 27, 2011, Foster & Garbus or NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01

(w). On February 2, 2011, Foster & Garbus or NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(x). On February 17, 2011, Foster & Garbus or NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(y). On February 21, 2011, Foster & Garbus sent a letter to Plaintiff using the United States mails falsely representing that he owed a debt of $2,752.01;

(z). On February 22, 2011, Foster & Garbus or NCO sent a letter to Plaintiff using the United States mails falsely representing that he owed a debt of $2,752.01;

(aa). On February 23, 2011, Foster & Garbus or NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(bb). On February 25, 2011, Foster & Garbus or NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

(cc). On December 29, 2011, Foster & Garbus or NCO used the telephone wires to call Plaintiff's home and falsely represent that Plaintiff owed a debt of $2,752.01;

109. Foster and Garbus, and NCO, maintained the lawsuit against Plaintiff LaCourte on behalf of (but without the involvement of) American Express, demanding $2,752.01 plus interest, until executing a Stipulation Discontinuing Action With Prejudice on July 27, 2012, in which Stipulation it was stipulated, admitted and conceded that: "the debt claimed in Plaintiff's [American Express'] Complaint is not owed by Defendant [James LaCourte] and was settled and

paid,...."

110.     As recently as January 4, 2012, NCO's account records indicate that neither it nor Foster & Garbus had received any "media" concerning the debt they alleged was owed by Plaintiff. Nevertheless, NCO and Foster & Garbus, knowing they did not possess any "media" (or back-up information), attempted to collect a false debt from Plaintiff, and which both NCO and Foster & Garbus knew was false, on at least twenty-eight occasions by mail or telephone, and filed a lawsuit against him in a state court. NCO's account records indicated that Plaintiff had settled his debt prior to October 18, 2010, which account records were provided to Foster & Garbus, and which pattern and practice of false, abusive and harassing debt demands were conceded Foster & Garbus, and indirectly by NCO, in the July 27, 2012 Stipulation Discontinuing Action With Prejudice.

111.     Each of the tens, if not hundreds, of thousands of uses of the mails and wires in connection with the Defendants' scheme to defraud, spanning a period of no fewer than four years, constitutes a separate instance of mail and/or wire fraud within the meaning of 18 U.S.C. § 1341 and 1343, and thus is also a predicate act, which taken together, constitute "a pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.

112.     In connection with Defendants' scheme, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. §1961 *et seq.*, and on countless occasions over a substantial period of time within ten years of each other. The acts of racketeering are an ongoing part of Defendants' regular way of doing business. The predicate acts have been and will be repeated over and over again.

*Relationship of Pattern of Racketeering Activity to Enterprise*

113. The goal of Defendants' enterprise is to obtain monies from consumers, including Plaintiff and the other members of the Class, for debts not owed, in whole or in part, through fraudulent collection activities, including, but not limited to, the commencement of debt collection lawsuits with the aim of obtaining default judgments.

114. The pattern of racketeering activity described above is integral to Defendants' scheme. Without engaging in mail or wire fraud, Defendants would be unable to obtain the default judgments they seek.

115. Each Defendant, individually and as a member of the enterprise, has conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through the pattern of racketeering activity described above. Accordingly, each Defendant has violated 18 U.S.C.§ 1962(c).

116. Each Defendant has knowingly agreed and conspired to violate the provisions of 18 U.S.C. §1692(c), including the numerous predicate acts of mail and wire fraud described above, and has thus violated 18 U.S.C. §1962(d).

117. As a direct and proximate result of the Defendants' RICO violations described herein, Plaintiff and the other members of the Class have suffered injury to their property within the meaning of 18 U.S.C. §1964 and are entitled to compensatory and treble damages in an amount to be determined at trial, and to a prospective order directing Defendants to disgorge their ill-gotten gains in order to deter them from engaging in similar conduct in the future and to permanently enjoin Defendants from all unlawful practices alleged in this Complaint.

## FIFTH CAUSE OF ACTION

### NEW YORK JUDICIAL LAW SECTION 487

(Against Foster & Garbus LLP and Does 1 through 150 Law Firm
Affiliates of NCO operating in New York)

118.     Plaintiff restates, realleges and incorporates by reference the foregoing paragraphs.

119.     New York law states that "an attorney or counsel who . . . is guilty or any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party . . . [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law . . . forfeits to the party injured treble damages, to be recovered in a civil action." N.Y. Jud. Law §487(I).

120.     As stated herein, Foster & Garbus and Does 1 through 150 Law Firm Affiliates of NCO that conduct business in New York, violated §487 of the New York Judiciary Law by engaging in deceit or collusion, or consenting to deceit or collusion, with the intention to deceive the courts and opposing party consumers, by inter alia, commencing debt collection lawsuits on behalf of NCO and/or NCO's clients, with no knowledge of the alleged underlying debt.

121.     Foster & Garbus and Does 1 through 150 Law Firm Affiliates of NCO that conduct business in New York committed the above-described acts willfully and/or knowingly and have caused injury and damages to Plaintiff and the other members of the Class, and unless enjoined, will cause further irreparable injury.  As a direct and proximate result, Plaintiff and the other members of the Class and Subclasses have suffered compensable harms and are entitled to recover actual and treble damages.

47

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for judgment against Defendant as follows:

A.    An order certifying this case as a class action under Fed. R. Civ. P. Rule 23, and appointing Plaintiff and his counsel to represent the Class;

B.    An order declaring that Defendants' alleged acts and practices constitute violation of the Fair Debt Collection Practices Act;

C.    An order declaring that Defendants' alleged acts and practices constitute violation of the Fair Credit Reporting Act;

D.    An order declaring that Defendants' alleged acts and practices constitute violation of the New York General Business Law §349;

E.    A permanent injunction against Defendants to enjoin continuing to harm Plaintiff and the other members of the Class;

F.    An order for Defendants' specific performance of its contractual obligations together with other relief required by contract law;

G.    Restitution to Plaintiff and the other members of the Class;

H.    Actual damages for injuries suffered by Plaintiff and the other members of the Class;

I.    Statutory damages pursuant to the FDCPA;

J.    Statutory damages pursuant to the FCRA;

K.    Treble damages pursuant to GBL §349 and the relief provided by GBL §349-c;

L.    Treble damages pursuant to RICO.

M. Treble damages pursuant to N.Y. Jud. Law §487; and

N. Reasonable attorney's fees and costs of this action, statutory pre-judgment interest, and such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury to the extent authorized by law.

DATED: December 28, 2012
New York, New York

TUSA P.C.
Joseph S. Tusa
1979 Marcus Avenue, Ste. 201
Lake Success, NY 11042
Tel. (516) 622-2212
Joseph.tusapc@gmail.com


GISKAN SOLOTAROFF ANDERSON
& STEWART LLP

Catherine E. Anderson
11 Broadway, Ste. 2150
New York, New York 10004
Tel. (212) 847-8315
canderson@gslawny.com

# EXHIBIT A

| | | |
|---|---|---|
| STATE OF OHIO | ) | DOCKET NO. 365737 |
| | ) | |
| IN THE MATTER OF: | ) | **ASSURANCE OF** |
| NCO FINANCIAL SYSTEMS, INC. | ) | **VOLUNTARY COMPLIANCE** |

## PREAMBLE

This Assurance of Voluntary Compliance (hereinafter referred to as "Assurance") is entered into between the Attorneys General of the States and Commonwealths of Alaska, Arkansas, Idaho, Illinois, Iowa, Kentucky, Louisiana, Michigan, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, Vermont, and Wisconsin (referred to collectively as the "Multi-State Working Group" or the "Participating States"), acting on behalf of their respective states, and pursuant to their respective Consumer protection and/or debt collection statutes[1], and NCO Financial Systems, Inc., a Pennsylvania corporation that engages in business in each of the Participating States.

---

[1] Alaska, Unfair Trade Practices and Consumer Protection Act, AS 45.50.471 et seq.; Arkansas, Ark. Code Ann. §4-88-101 et seq.; Idaho, Idaho Consumer Protection Act, Idaho Code section 48-601 et seq.; Illinois, Illinois Collection Agency Act, 225 ILCS 425/1 et seq. and the Illinois Consumer Fraud & Deceptive Business Practices Act, 815 ILCS 505/1 et seq.; Iowa, Iowa Consumer Fraud Act: Iowa Code section 714.16 and Iowa Debt Collection Practices Act: Iowa Code sections 537.7101 – 537.7103; Kentucky, Kentucky Consumer Protection Act, KRS 367.110 et seq.; Louisiana, Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401 et seq.; Michigan, Regulation of Collection Practices Act, MCL 445.251, et seq.; Nebraska, NE Consumer Protection Act, NRS. §§59-1601 *et seq.* and NE Uniform Deceptive Trade Practices Act, NRS. §§87-301 *et seq.*; Nevada, Nevada Deceptive Trade Practices Act, NRS 598.0903 et. seq.; New Mexico, New Mexico Unfair Practices Act, NMSA 1978, Sec. 57-12-1 et seq. (1967); North Carolina, North Carolina Collection Agency Act, N.C. Gen. Stat. § 58-70-1, *et seq.*, and the North Carolina Unfair Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.*; North Dakota, North Dakota Century Code (N.D.C.C.) § 51-15-01 et seq.; and N.D.C.C. ch. 13-05.; Ohio, Ohio Consumer Sales Practices Act, R.C. 1345.01 et seq.; Oregon, Oregon Unlawful Trade Practices Act, Oregon Revised Statute (ORS) 646.605 to 646.656, including Oregon's Unlawful Collection Practices Act, ORS 646.639.; Rhode Island, R.I. Gen. Laws §6-13.1-1, *et seq.*, commonly referred to as the Rhode Island Deceptive trade Practices Act; R.I. Gen. Laws §19-14.9-1, *et seq.*, commonly referred to as the Rhode Island Fair Debt Collection Act; South Carolina, South Carolina Unfair Trade Practices Act, South Carolina Code Ann. Sections 39-5-10, et seq.; Vermont, Vermont Consumer Fraud Act, 9 V.S.A. s 2451, et seq. and Vermont's Consumer Fraud Rule 104; Wisconsin, Wis. Stats. § 427.104 and Wis. Adm. Code DFI-Bkgch. ch. 74.

## I. __GENERAL PROVISIONS__

Recognizing that the State of Ohio, by and through Attorney General Michael DeWine, and NCO Financial Systems, Inc. ("NCOF"), by its counsel, have consented to the entry of this Assurance, agree as follows:

1.1    Venue is proper over this Assurance and its enforcement because the alleged violations of the Ohio Consumer Sales Practices Act ("CSPA"), R.C. 1345.01 et seq., the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq., and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq. occurred here in the State of Ohio.

1.2    Attorney General DeWine has authority under R.C. 1345.06 to bring consumer protection and debt collection actions on behalf of the State of Ohio.

1.3    This Assurance shall be governed by the laws of the State of Ohio.

1.4    This Assurance is entered into by NCOF as a free and voluntary act and with full knowledge and understanding of the nature of the proceedings and the obligations and duties imposed by this Assurance.

1.5    Nothing in this Assurance constitutes any agreement by the Parties concerning the characterization of the amounts paid pursuant to this Assurance for purposes of the Internal Revenue Code or any state tax laws, or the resolution of any other matters.

1.6    This Assurance constitutes a complete settlement and release of all claims on behalf of the signatory Attorneys General against NCOF with respect to all civil claims, causes of action, damages, fines, costs or penalties for alleged violations of the States' respective Consumer Protection Acts cited in footnote 1, arising from any acts, policies or practices which were known prior to the Effective Date of this Assurance and which were related to or based

- 2 -

upon NCOF's debt collection practices and were addressed as identified in Paragraphs 6.2a-ff of this Assurance.

1.7 The States and NCOF have agreed to the entry of this Assurance without trial of any issue of fact or law. This Assurance is entered into only for the purpose of resolving the issues raised in this Assurance and does not bind any other officers or agencies of the respective States to this Assurance. This Assurance shall not be construed to nor does it resolve or preclude any other action, civil, criminal, or administrative.

1.8 Nothing contained herein shall be construed to waive any individual right of action by a Consumer or any action by a local, state, federal, or other governmental entity.

1.9 Nothing in this Assurance shall in any way preclude any investigation or enforcement action against NCOF under any legal authority granted to the State for any activities related to NCOF's business practices, as well as transactions not subject to this action.

1.10 NCOF shall not represent directly or indirectly or in any way whatsoever imply that the Signatory Attorney General has sanctioned, condoned, or approved any part or aspect of NCOF's business practices, current efforts to reform its practices, or any further practices that NCOF may adopt or consider adopting.

## II. DEFINITIONS

For purposes of this Assurance, the following words or terms shall have the following meaning:

2.1 "Affiliate" means a business entity that is owned by, operated by, controlled by, or under common control with another business entity.

2.2 "Call Center" means any physical location from which NCOF places or receives Consumer credit Debt Collection phone calls.

2.3 "Collection Center" means any physical location from which NCOF sends or receives Consumer credit Debt correspondence.

2.4 "Communication" means the conveying of information regarding a Debt directly or indirectly to any person through any medium, as that term is defined in the FDCPA, 15 U.S.C. § 1692(a)(2).

2.5 "Consumer" means any natural person obligated or allegedly obligated to pay any Debt, as that term is defined in the FDCPA, 15 U.S.C. § 1692(a)(3).

2.6 "Creditor" means any person who offers or extends credit creating a Debt or to whom a Debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a Debt in default solely for the purpose of facilitating collection of such Debt for another, as that term is defined in the FDCPA, 15 U.S.C. § 1692(a)(4).

2.7 "Debt" means any obligation or alleged obligation of a Consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family or household purposes, whether or not such obligation has been reduced to judgment, as that term is defined in the FDCPA, 15 U.S.C. § 1692(a)(5).

2.8 "Debt Collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any Debts, as defined by 15 U.S.C. § 1692(a)(5), or who regularly collects or attempts to collect, directly or indirectly, Debts owed or due or asserted to be owed or due another, as that term is defined in the FDCPA, 15 U.S.C. §§ 1692(a)(6)(A) – (F), and/or as that term is defined under applicable state law.

2.9    "Debt Collection" means any activity the principal purpose of which is to collect, or attempt to collect, directly or indirectly, Debts owed, or asserted to be owed, or due, regardless of whether collection of the Debt is governed by the FDCPA, to the extent that any individual state Attorney General has jurisdiction over non-Consumer Debt Collection activities.

2.10    "Effective Date" shall mean the latest date by which all Parties have executed this Assurance or the date on which this Assurance is filed.

2.11    "Furnisher of Credit Information" to "consumer reporting agencies" means a person who furnishes information to consumer reporting agencies relating to Consumers, as those terms are defined or used in the FCRA, 15 U.S.C. §§ 1681-1681(x).

2.12    "Location information" means a Consumer's place of abode and the Consumer's telephone number at such place or at the Consumer's place of employment, as that term is defined in the FDCPA, 15 U.S.C. § 1692(a)(7).

2.13    "Multi-State Executive Committee" shall refer to a committee comprising representatives from the States of Illinois, Louisiana, Nevada, New Mexico, and Ohio.

2.14    "Multi-State Working Group" or "Participating States" shall refer to the States and Commonwealths of Alaska, Arkansas, Idaho, Illinois, Iowa, Kentucky, Louisiana, Michigan, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, Vermont, and Wisconsin collectively.

2.15    "NCOF" shall mean NCO Financial Systems, Inc., doing business under its own name, or under any other business names, including its officers, directors, agents, representatives, salespersons, employees, instructors, affiliates, successors, and assigns, and all persons acting in concert or participation with NCOF, directly or indirectly, whether acting

individually, or acting on behalf of NCOF or at its direction, through any corporate device, partnership or association through which they may now or hereafter act or conduct business.

 a. "NCOF" shall not mean an "Independent Contractor" who is a person or entity who provides services and who, in the provision of such services, is free from direction and control over the means and manner of providing the services, subject only to the right of NCOF to specify the desired result. Independent contractor status cannot be a subterfuge to avoid employee status, including an apparent agency relationship.

 b. "NCOF" shall not mean JP Morgan Chase.

2.16 "Ohio Assurance" shall refer to the Ohio Assurance of Voluntary Compliance entered into between the State of Ohio Office of the Attorney General and NCOF.

2.17 "Parties" to this Assurance shall mean the State of Ohio Office of the Attorney General and NCO Financial Systems, Inc. as defined in Paragraph 2.15 above.

2.18 "Representative" means an employee of NCOF and/or any and all other persons, corporations, partnerships, or other entities that NCOF has the power or right to control and direct in the material details and means of how their work is to be performed.

2.19 "Supplier" means a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting Consumer transactions, whether or not the person deals directly with the Consumer, as that term is defined in R.C. 1345.01(C).

2.20 "Time-barred" Debt means any Debt that is beyond the applicable statute of limitations.

## III. REPRESENTATIONS AND WARRANTIES

3.1    NCOF warrants and represents that it and its predecessors are engaged in trade and commerce within the Participating States by, among other things, the operation of a Debt Collection business, as a Debt Collector, as that term is defined in the FDCPA, 15 U.S.C. § 1692(a)(6)..

3.2    NCOF warrants and represents that it and its predecessors are "Furnishers of Credit Information" to consumer reporting agencies as that term is defined in Section II of this Assurance and in the FCRA, 15 U.S.C. §§ 1681-1681(x).

3.3.    NCOF warrants and represents that it and its predecessors are "Suppliers" as that terms is defined in Section II of this Assurance and in R.C. 1345.01(C).

3.4    NCOF and the Participating States warrant and represent that they negotiated the terms of this Assurance in good faith.

## IV. BACKGROUND AND STATEMENT OF FACTS

4.1    NCO Group, Inc. is the ultimate corporate parent of NCOF.

4.2    NCOF is a Pennsylvania corporation that engages in business in each of the Participating States, of which its principal place of business is 507 Prudential Road, Horsham, Pennsylvania, 19044.

4.3    NCOF is, and has been at all times relevant to this action, engaged in providing Debt Collection services by regularly collecting, or attempting to collect, Debts that were due or alleged to be due from Consumers.

4.4    NCOF has been assigned Debts for collection from various Creditors or entities for the purpose of attempting to collect those Debts from Consumers.

4.5     NCOF has attempted to collect on alleged Debts through collection letters sent to Consumers from NCOF's collection centers.

4.6     NCOF has attempted to collect on alleged Debts through telephone calls made by NCOF's Debt Collector employees from NCOF's Call Centers.

## V.     ALLEGATIONS

The Participating States allege that NCOF has engaged in conduct in violation of the CSPA, R.C. 1345.01 et seq., the FDCPA, 15 U.S.C. § 1692 et seq., and the FCRA, 15 U.S.C. § 1681 et seq., including, but not limited to, the following: (1) engaging in or using unfair or deceptive Debt Collection acts and/or practices in violation of the CSPA, R.C. 1345.01 et seq., and/or in violation of the FDCPA at 15 U.S.C. §§ 1692b(2), 1692b(3), 1692c(a)(1), 1692c(a)(2), 1692c(a)(3), 1692c(c), 1692d, 1692d(2), 1692d(5), 1692d(6), 1692g(a) and 1692g(b); (2) engaging in or using false, deceptive, or misleading representations or means in connection with the collection of Debts in violation of the CSPA, R.C. 1345.01 et seq., and/or in violation of the FDCPA at 15 U.S.C. §§ 1692e, 1692e(2)(A)(B), 1692e(4), 1692e(5), and 1692e(10); (3) engaging in or using unfair means to collect or attempt to collect Debts in violation of the CSPA, R.C. 1345.01 et seq., and/or in violation of the FDCPA at 15 U.S.C. §§ 1692f, 1692f(1), and 1692f(6); (4) furnishing credit information to consumer reporting agencies in violation of the FCRA at 15 U.S.C. §§ 1681s-2(a)(1)B), 1681s-2(a)(3), and 1681s-2(b); and (5) otherwise violating the CSPA, R.C. 1345.01 et seq., the FDCPA, and/or the FCRA.

NCOF denies these allegations.

## VI.   ASSURANCE

6.1   **Compliance with All Laws**.  NCOF shall comply with the CSPA, R.C. 1345.01 et seq., the FDCPA, 15 U.S.C. § 1692 et seq., and the FCRA, 15 U.S.C. § 1681 et seq.

6.2   **Compliance with Specific Laws**.  Through this Assurance, NCOF shall not:

a.  Violate the FDCPA, 15 U.S.C. § 1692 et seq.;

b.  Violate the FCRA, 15 U.S.C. § 1681 et seq.;

c.  Communicate that Consumers owe Debts when communicating with any person other than the Consumers for the purposes of acquiring location information, in violation of the FDCPA, 15 U.S.C. § 1692b(2);

d.  Communicate with persons other than the Consumer more than once, when not requested to do so by such person, and when NCOF does not reasonably believe that the earlier response of such person was erroneous or incomplete and that such person now has correct or complete location information, in violation of the FDCPA, 15 U.S.C. § 1692b(3);

e.  Communicate with Consumers in connection with the collection of Debts at times or places NCOF knows or should know to be inconvenient to the Consumers, including during inconvenient hours, in violation of the FDCPA, 15 U.S.C. § 1692c(a)(1);

f.  Communicate with Consumers in connection with the collection of Debts, without the prior consent of the Consumers, after knowing that the Consumers were represented by attorneys with respect to the alleged Debts, in violation of the FDCPA, 15 U.S.C. § 1692c(a)(2);

g. Communicate with Consumers in connection with the collection of Debts at the Consumers' places of employment when NCOF knows or should know that the Consumers' employers prohibit the Consumers from receiving such communications, in violation of the FDCPA, 15 U.S.C. § 1692c(a)(3);

h. Communicate with Consumers in connection with the collections of Debts, except as otherwise provided by law, after being notified in writing that the Consumers refuse to pay the Debts or that the Consumers wish NCOF to cease further communications with the Consumers, in violation of the FDCPA, 15 U.S.C. § 1692c(c);

i. Engage in conduct the natural consequence of which was to harass, oppress, or abuse persons in connection with the collection of a Debt, in violation of the FDCPA, 15 U.S.C. § 1692d;

j. Use obscene or profane language in connection with the collection of Debts, in violation of the FDCPA, 15 U.S.C. § 1692d(2);

k. Place multiple telephone calls within a short period of time to Consumers for purposes of annoying or harassing Consumers at the called numbers, in violation of the FDCPA, 15 U.S.C. § 1692d(5);

l. Attempt to collect alleged Debts by telephone without providing the meaningful disclosure of the caller's identity, in violation of the FDCPA, 15 U.S.C. § 1692d(6);

m. Use false or misleading representations to collect or attempt to collect Debts or to obtain Location Information, in violation of the FDCPA, 15 U.S.C. § 1692e;

n. Falsely represent the character, amount, or legal status of Debts or services rendered or compensation which may be lawfully received by Debt Collectors for the collection of Debts, in violation of the FDCPA, 15 U.S.C. § 1692e(2)(A)(B);

o. Represent or imply to Consumers that nonpayment of Debts will result in the arrest or imprisonment of the Consumers, or the seizure, garnishment, attachment, or sale of any of the Consumers' property or wages when there is no legal authority or intention to do so, in violation of the FDCPA, 15 U.S.C. § 1692e(4);

p. Threaten to take legal actions when there is no legal authority or intention to do so, in violation of the FDCPA, 15 U.S.C. § 1692e(5);

q. Use any false representation or deceptive means to collect or attempt to collect any Debt or to obtain information concerning a Consumer, in violation of the FDCPA, 15 U.S.C. § 1692e(10);

r. Use unfair or unconscionable means to collect or attempt to collect Debts, in violation of the FDCPA, 15 U.S.C. § 1692f;

s. Collect or attempt to collect amounts (including interest, fees, charges, or expenses incidental to the principal obligation) that were not expressly authorized by the agreements creating the Debts or permitted by law, in violation of the FDCPA, 15 U.S.C. § 1692f(1);

t. Take or threaten to take nonjudicial actions against Consumers' real or personal properties or wages when there is no legal authority or intention to do so, in violation of the FDCPA, 15 U.S.C. § 1692f(6);

u. Fail to provide written notices to Consumers, within five days after initial telephone contact, that contained the following information: the amount of the Debt; the name of the Creditor; a statement that unless the Consumer disputes the validity of the Debt within thirty days NCOF will assume the Debt is valid; the process by which the Consumer may request verification of a Debt; and a statement that upon the Consumer's written request within thirty days, NCOF would provide the name of the original Creditor, if different from the current Creditor, in violation of the FDCPA, 15 U.S.C. § 1692g(a);

v. Fail to cease collection activities upon the receipt of written notifications from Consumers of disputes, or requests for the names of the original Creditors or for verification of the Debts alleged to be owed, until the NCOF mails verifications or the debts to the Consumers, in violation of the FDCPA, 15 U.S.C. § 1692g(b);

w. Attempt to collect on Debts that are not owed by the Consumers contacted by the NCOF;

x. Fail to remove telephone numbers from collection account records and continue to place telephone calls to those numbers after being informed that the person from whom NCOF sought to collect the Debts cannot be reached at the numbers called;

y. Communicate with third parties more than once after the third parties provide NCOF with Location Information or indicate that they do not have the Location Information being sought, unless NCOF has a reasonable belief that the earlier response of such person was erroneous or incomplete and that such

person now has correct or complete Location Information, pursuant to FDCPA, 15 U.S.C. § 1692b(3);

z. Except as permitted by law, communicate with or divulge information to third parties, without the prior consent of the Consumers, regarding alleged Debts owed by Consumers in an effort to embarrass or persuade the Consumers to pay the Debts;

aa. Fail to inform Consumers, upon receiving oral requests for verification of Debts, that requests to verify Debts must be made in writing, or failing or refusing to provide Consumers with the address to where the written requests must be mailed, or both;

bb. Collect or attempt to collect on settled Debts;

cc. Fail to honor or confirm settlement agreements in writing with Consumers and continue to attempt to collect additional amounts or the full amount of the Debts allegedly owed;

dd. Withdraw money from Consumers' bank accounts, on dates or in dollar amounts, not authorized by Consumers;

ee. Collect or attempt to collect on Debts that have been discharged in bankruptcy.

ff. Collect or attempt to collect on Debts when the Consumer has notified NCOF that they are the victim of identity theft, until NCOF takes the appropriate steps under applicable state law to determine that the Consumer is responsible for the specific Debt in question.

6.3   **General Compliance**:  Within thirty calendar days of the Effective Date of this Assurance, NCOF shall:

    a.  Train employees to answer all questions on first contact with the Consumer in a respectful manner;

    b.  Send written communication within five calendar days of the first telephone contact with a Consumer and include the amount of the Debt, the name and contact information of the Creditor, notice that the Consumer has thirty calendar days to dispute the Debt, how to dispute the Debt, and how to request validation of the Debt;

    c.  In all collection notices, always itemize the amount owed;

    d.  Maintain confidentiality of all financial information, including, but not limited to, truncating social security and credit card numbers, in compliance with R.C. 1349.18 and the CSPA, R.C. 1345.02, or other applicable state, federal and local law regarding maintenance of the confidentiality of all financial information;

    e.  Attempt collection against any spouses of deceased debtors only if NCOF first validates the Debt, obtains and possesses information supporting a good faith claim that the surviving spouse is legally obligated on the Debt and provides this information to the surviving spouse[2];

    f.  Maintain collectors' activity logs with detailed information and/or codes for deciphering abbreviations, including, but not limited to:

        (1) The exact number called;

---

[2] This provision shall be subject to the final rules promulgated by the Federal Trade Commission ("FTC") clarifying how to collect decedents' debts.

(2) The exact name of the debtor trying to be reached;

(3) The duration of the call, noting the time the call began;

(4) Whether a message was left and with whom;

(5) When possible, the exact name of the person with whom the Debt Collector spoke;

(6) A summary of what was said (a) in the first contact message, (b) in any subsequent messages, and (c) in any offers to settle the Debt;

(7) If a settlement was offered, the terms of the settlement, including the total amount to be paid and the payment schedule; and

(8) The reason for communicating with a third-party in connection with a collection attempt.

g. In connection with NCOF's business activities in collecting or attempting to collect on Debts, NCOF must, prior to withdrawing funds from Consumers' bank accounts, whether by automatic debit, simulated check or otherwise, obtain the following information from the Consumer:

(1) The name and address of the Consumer;

(2) The account number from which funds will be withdrawn;

(3) The routing number of the account from which funds will be withdrawn;

(4) The check number or numbers (if applicable);

(5) The exact dollar amount of the funds to be withdrawn in each installment (if applicable);

(6) The exact date or dates the funds will be withdrawn; and

(7) Express authorization for the funds to be withdrawn from the account.

If funds are to be withdrawn from a Consumer's account in installments, the information in items (1) through (7) above shall additionally be sent to the Consumer in writing at least three but

not more than ten calendar days prior to each installment payment being withdrawn from the account in accordance with the FDCPA.

h. Confirm all settlement agreements by mailing written documents to Consumers within seven calendar days of the agreement that include:

    (1)    Total amount owed;

    (2)    Itemization of all fees;

    (3)    Interest;

    (4)    Principal;

    (5)    Date Debt incurred;

    (6)    Approval of Creditor (holder of the account);

    (7)    Agreement to update status of debt if previously reported by NCOF to a credit reporting agency; and

    (8)    Agreement to provide written confirmation to validate when the settlement amount is paid in full.

i. NCOF will direct its affiliate, NCO Portfolio Management, Inc., and related Debt buying companies to not sell or provide a Debt to any other entity, other than the client from which it was obtained, if an investigation reveals that the Debt cannot be substantiated as complete and accurate or that the Debt has been paid or that the Consumer was victim of identity theft.

j. Cease collecting or attempting to collect Debts when the Consumer has notified NCOF that the Consumer is the victim of identity theft until NCOF takes the appropriate steps under applicable state law to determine that the Consumer is responsible for the specific Debt in question.

6.4     **Reporting**.  To the extent that a Debt has been credit reported, as part of the regular NCOF credit reporting update process, NCOF shall notify credit reporting agencies within thirty calendar days of either of the following:

> a. Any verbal or written Consumer dispute, including notification by the Consumer that the Consumer is the victim of identity theft and thus not responsible for the Debt; or
>
> b. Receipt of the results of an investigation as to the accuracy or completeness of information previously reported, including that such Debt has been paid.

6.5     **Notice to Consumers**.  Within thirty calendar days of and for a period of five years from the Effective Date of this Assurance, NCOF and its owners, officers, directors, agents, employees, salespersons, Representatives, Independent Contractors, Affiliates, and all persons or entities in active concert or participation with NCOF in connection with NCOF's actions as a Debt Collector in the collection of Debts from Consumers shall make the following disclosure clearly and conspicuously on the back of each written collection communication that is sent to a Consumer for the purpose of collecting a Debt:

> Federal and State law prohibit certain methods of debt collection and require that we treat you fairly.  For Ohio residents, please view our website at www.ncogroup.com to review your rights under Federal and State law.

6.6     NCOF shall not be considered to be out of compliance with these compliance procedures in the event any Representative or Independent Contractor misrepresents its activities to NCOF or conceals the true nature of its activities, so long as NCOF can show that it has taken the steps noted in Section VII below to ascertain the truth and discipline the Representatives and Independent Contractors engaged in misrepresentations to NCOF.

## VII.  COMPLIANCE MONITORING

To the extent they are not already the existing practices, NCOF agrees to adopt and implement the following policies and procedures:

7.1    NCOF shall maintain measures reasonably necessary to ensure that its Representatives, as defined herein, are properly trained and are otherwise performing their duties in compliance with all applicable laws, including, but not limited to, the CSPA, R.C. 1345.01 et seq., the FDCPA, 15 U.S.C. § 1692 et seq., and/or the FCRA, 15 U.S.C. § 1681 et seq.  NCOF shall further adhere to its policy of disciplining, up to and including the termination of, Representatives that have not complied with the requirements of this Assurance and/or all applicable laws, including, but not limited to the CSPA, R.C. 1345.01 et seq., the FDCPA, 15 U.S.C. § 1692 et seq., and/or the FCRA, 15 U.S.C. § 1681 et seq.  NCOF shall maintain all records referenced in this paragraph and shall, within fourteen days of receiving a request from the Signatory Attorney General, produce a copy of all such records.

7.2    When NCOF hires, retains, and/or enters into an agreement with an Independent Contractor, as defined herein, NCOF shall notify and require, through representations and warranties in their contracts with all Independent Contractors, that each Independent Contractor (1) must comply with the CSPA, R.C. 1345.01 et seq., the FDCPA, 15 U.S.C. § 1692 et seq., and/or the FCRA, 15 U.S.C. § 1681 et seq., (2) refrain from engaging in the acts and practices described in Section VI, Paragraphs 6.2a-6.2ff, and (3) comply with the practices set forth in Section VI, Paragraphs 6.3a-6.3j.  Further, NCOF shall clearly and conspicuously notify such Independent Contractor that any and all of their Debt Collection acts and/or practices must be consistent with NCOF's policies and procedures consistent with the terms of this Assurance. NCOF shall train and sufficiently monitor Independent Contractors in accordance with the

provisions stated herein.  Should NCOF learn that any Independent Contractor is acting in violation of the law or the requirements of this Assurance, NCOF shall immediately take action to enforce its contractual rights with such Independent Contractor regarding the violations, including as described herein.  NCOF shall monitor and enforce its contractual rights, up to and including termination of any Independent Contractor which is in violation of the law, this Assurance, or its contract with NCOF.

      7.3     Unless otherwise noted herein, NCOF shall create, to the extent not already existing, and shall adopt and implement written procedures reasonably expected to create continuing compliance and otherwise comply with any and all terms of this Assurance within thirty calendar days after the Effective Date of this Assurance.

      7.4     NCOF shall create, to the extent not already existing, and shall maintain written policies and procedures reasonably necessary to ensure Consumer complaints are quickly responded to and that a good faith effort is made to resolve such complaints in a timely manner. Such policies and procedures shall include, but are not limited to:

      a. Policies and procedures reasonably necessary to ensure that all Consumer complaints are sufficiently documented, with such documentation containing the following minimum information: (1) the name and account number (or other identifying information) of each Consumer; (2) a summary of the Consumer's complaint and action taken by NCOF to resolve the complaint; (3) the name and other sufficient identifying information of the Representative(s) and/or Independent Contractor(s) involved with such complaint; and (4) a summary of any actions taken by NCOF with regard to the handling of the complaint by the

Representative(s) and/or Independent Contractor(s), including any disciplinary action taken against the Representative(s) and/or Independent Contractor(s). NCOF shall retain all such records and documentation for a period of three years.

b.  Policies and procedures necessary to generally ensure that Consumer complaints to NCOF are answered in a timely manner.

c.  Policies and procedures necessary to generally ensure compliance with validation requests by Consumers. Such policies and procedures may include any lawful conduct with regards to electing to close accounts and cease related collection efforts.

7.5    NCOF shall maintain copies of all policies and procedures referenced in Paragraph 7.4 of this Assurance and shall, within fourteen calendar days of receiving a request from the Signatory Attorney General, produce a copy of all such policies and procedures.

7.6    For a period of eighteen months starting November 1, 2011, NCOF shall monitor twenty-five thousand (25,000) randomly selected Debt Collection phone calls placed by NCOF's Representatives during that time period. NCOF personnel will monitor and evaluate calls for the following:

a.  Whether NCOF's Representatives making Debt Collection phone calls to Consumers beginning with a statement that includes the words: "This call may be monitored or recorded;"

b.  Whether NCOF's Representatives appropriately document the status/disposition associated with the Consumer contacts in the collection system; and

c.  Whether any of the following occurs when NCOF's Representatives make Debt

Collection phone calls:

(1) Except as permitted by applicable law, disclosure of the existence of a Debt or NCOF's third party Debt Collector status to anyone other than the Consumer;

(2) Misrepresenting NCOF's status as a third party Debt Collector, or NCOF's Representatives identifying themselves as anything but a Debt Collector to a Consumer;

(3) A Consumer is subjected to profanity, rudeness, or inappropriate threats;

(4) The Consumer is contacted at work if the collector knows or has reason to know that the Consumer's employer prohibits the Consumer from receiving such communication at work;

(5) A message is left for the Consumer at another number other than the Consumer's home or business after the Consumer has already been reached;

(6) A Consumer has been improperly threatened with potential legal action or wage garnishment;

(7) All written cease and desist requests were honored; and

(8) Except as required by applicable law, any voice message for a return call is left, beyond anything other than the collector's name, telephone number, and ID code.

7.7    NCOF shall monitor its Representatives and the calls they make, and its Consumer Debt accounts over a period of eighteen months from the date of this Assurance ("Reporting Period") to ensure that NCOF and its Representatives are complying with relevant laws, policies and procedures, including but not limited to those set forth herein.

7.8    NCOF shall issue a report ("Report") to the Participating States every six months during the Reporting Period, which shall begin on November 1, 2011, which shall include the evaluation of NCOF's compliance with this Assurance and the factual basis for said evaluation. In the event the Attorney General receives a third party request for a Report issued by NCOF pursuant to this Assurance, the Attorney General will notify NCOF of the third party request so

that NCOF may seek any type of protection afforded under applicable state law, including but not limited to a protective order. The Attorney General commits to provide NCOF with at least ten calendar days' advance notice before complying with any third party request for a Report, to the extent permitted by state law and with any required lesser advance notice.

7.9    In the event any Report should show a violation of the law or the requirements of this Assurance, or NCOF should learn any of its Representatives or Independent Contractors are acting in violation of the law or the requirements of this Assurance, NCOF shall immediately take appropriate action relating to its Representatives or Independent Contractors and will enforce its contractual rights with such Independent Contractors regarding the violations, including as described herein. NCOF shall monitor and enforce its contractual rights, up to and including termination of any Representative or Independent Contractor that violates the law, this Assurance, or its contract with NCOF.

7.10    **Retention of Documents**.    NCOF shall generate, retain and make readily available to the Participating States for inspection, upon reasonable notice and without the necessity of a subpoena or other legal process, all material records and documents reasonably necessary to document compliance with this Assurance. NCOF shall maintain these records and documents for a minimum of four years after the final Report.

## VIII. CONSUMER RESTITUTION

NCOF shall set aside Fifty Thousand Dollars ($50,000) per each Signatory State to be available for restitution for Consumer redress. For a period of three years from the Effective Date of this Assurance, NCOF shall pay claims for restitution to the State of Ohio Office of the Attorney General, as provided herein, not to exceed a total payment in the amount of Fifty Thousand Dollars ($50,000). During that time period, the State of Ohio may submit a claim for

restitution to NCOF demonstrating a prima facie showing that, as a result of third party Debt Collection efforts undertaken by NCOF, a Consumer of the state: (1) paid a third party Consumer Debt to NCOF that was not owed by the Consumer; (2) overpaid interest on a third party Consumer Debt not supported by the underlying agreement between the debtor and the original holder of the Debt or as otherwise permitted by law; or (3) paid an amount on a third party Consumer Debt in excess of an amount NCOF agreed to settle the account. NCOF will refund the Consumer an amount equal to the Consumer's overpayment to NCOF within thirty calendar days of receipt of the State's claim for restitution, unless NCOF provides information within that thirty calendar day period that raises a question of fact regarding the validity of the claim. If such evidence is provided by NCOF, the State will have thirty calendar days to evaluate the validity of the claim. The State of Ohio Attorney General's decision will be final and binding upon the State and NCOF. Nothing in this paragraph limits or restricts the right of a state or of an individual Consumer to seek restitution or pursue any other remedy provided by law, regardless whether the amount set aside under this paragraph has been depleted.

## IX. PAYMENT TO THE STATE

9.1     NCOF shall pay Five Hundred Seventy-Five Thousand Dollars ($575,000.00) to be divided and paid by NCOF directly to the following sixteen Signatory Attorney Generals of the Multistate Working Group in amount to be designated by and in the sole discretion of the Multistate Executive Committee: Alaska, Arkansas, Idaho, Illinois, Iowa, Louisiana, Michigan, Nebraska, Nevada, New Mexico, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, and Wisconsin.

9.2     Upon the Effective Date of the Ohio Assurance, the Multistate Executive Committee will provide NCOF with instructions for the payments to be distributed under this

Section. Said payment shall be paid within thirty calendar days of the Effective Date of this Assurance and shall be used by the Signatory Attorney General for such purposes that may include, but are not limited to, attorneys' fees, investigative costs, Consumer education, litigation funds, local Consumer aid funds, public protection or Consumer protection purposes or other purposes as allowed by state law at the sole discretion of each Signatory Attorney General.

## X.    COMPLIANCE PROCESS WITH ASSURANCE

10.1    NCOF shall keep for three years records sufficient to establish its compliance with the terms of this Assurance and shall permit an authorized representative of the Signatory Attorney General within ten calendar days' notice to inspect and/or copy any such records during normal business hours. Such records must be maintained in a secure manner, in compliance with Gramm-Leach-Bliley Act and the laws of the Participating States, to prevent identity theft.

10.2    In the event that any Signatory Attorney General has reason to believe that NCOF has failed to abide by this Assurance, and absent exigent circumstances, the Signatory Attorney General shall give NCOF fifteen calendar days' notice (the "Notice") before filing a motion or other pleading seeking to enforce this Assurance. The Notice shall be in writing and shall set forth those provisions of the Assurance that the Signatory Attorney General believes have been violated. The fifteen calendar day period ("Notice Period") shall provide NCOF an opportunity to respond to the assertions of the Signatory Attorney General and the parties may use the Notice Period to attempt a resolution of the concerns. Within the Notice Period, NCOF shall provide the Signatory Attorney General with a written response containing NCOF's reply to the assertions made in the Notice and the steps that NCOF has taken or will take to resolve the alleged violation(s). The Signatory Attorney General and NCOF agree to attempt to resolve any alleged violation(s) of this Assurance through good faith negotiation prior to the Signatory

Attorney General initiating any action for enforcement. This provision does not preclude any Signatory Attorney General from filing an action without complying with this provision if such Signatory Attorney General believes such immediate action is necessary to protect Consumers from immediate harm.

10.3    In the event that any Signatory Attorney General initiates legal action or incurs any costs to compel NCOF to abide by this Assurance, upon proof of the violation, NCOF shall be liable to the Signatory Attorney General for any such reasonable costs associated with proving that violation, including, but not limited to, a reasonable sum for attorneys' fees.

10.4    Failure of the Signatory Attorney General to timely enforce any term, condition, or requirement of this Assurance shall not provide, nor be construed to provide, NCOF a defense for noncompliance with any term of this Assurance or any other law, rule, or regulation; nor shall it stop or limit the Signatory Attorney General from later enforcing any term of this Assurance or seeking any other remedy available by law, rule, or regulation.

**JOINTLY APPROVED FOR ENTRY AND SUBMITTED BY:**


Melissa G. Wright (0077843)                    Date 10/5/11
Associate Assistant Attorney General
Consumer Protection Section
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
(614) 466-8169
(866) 528-7423 (facsimile)

*Counsel for the Ohio Attorney General*

**FOR NCO FINANCIAL SYSTEMS, INC.**

Joshua Gindin
Executive Vice President and General Counsel

_____
Date  10/4/11

David Israel  (LA Bar No. 7174)
SESSIONS, FISHMAN, NATHAN & ISRAEL, LLC
Lakeway Two, Suite 200
3850 N. Causeway Blvd.
Metairie, Louisiana 70002-7227
(504) 846-7900
(504) 828-3737 (facsimile)
disrael@sessions-law.biz

_____
Date  9/30/11

*Counsel for NCO Financial Systems, Inc.*

- 26 -

| STATE OF OHIO | : | DOCKET NO. 365737 |
| | : | |
| IN THE MATTER OF: | : | **AGREED AMENDMENT TO** |
| NCO FINANCIAL SYSTEMS, INC. | : | **ASSURANCE OF VOLUNTARY COMPLIANCE** |

On October 4, 2011, Ohio Attorney General Michael DeWine and NCO Financial Systems, Inc. ("NCOF" or collectively, the "Parties") entered into an Assurance of Voluntary Compliance ("Assurance"). Pursuant to subsequent discussions regarding implementation of certain provisions of the Assurance, the Parties hereby agree to replace the following subsections in their entirety with the language stated below.

6.3     **General Compliance**: As detailed in ¶¶ 7.1 and 7.2 herein, within thirty calendar days of the Effective Date of this Addendum, NCOF shall:

   c. In connection with all Debt Collection notices where an oral or written request is made by the Consumer to do so, itemize all amounts owed or provide a "break-out" of the total amount owed as made available by NCOF's client. If NCOF is unable to itemize the amounts owed or cannot obtain that information from NCOF's Debt Collection client, NCOF will consider the account disputed, will close the account, and will cease any and all Debt Collection efforts related to that account;

   h. As detailed in ¶¶ 7.1 and 7.2 herein, confirm all settlement agreements by mailing written documents to Consumers within seven calendar days of the settlement agreement that include:

(2)     Itemization of all fees as made available by NCOF's Debt Collection client, if requested by the Consumer, either orally or in writing. If NCOF is unable to itemize the fees and amounts owed or cannot obtain that information from NCOF's client, NCOF will consider the account disputed, will close the account, and will cease any and all Debt Collection efforts related to that account. Further, the settlement agreement between NCOF and the Consumer will be considered null and void as it pertains to the now-disputed account and the Consumer will no longer be held to the terms of such agreement;

(3)     Itemization of the interest charged on the account as made available by NCOF's Debt Collection client, if requested by the Consumer, either orally or in writing. If NCOF is unable to itemize the interest charged or cannot obtain that information from NCOF's client, NCOF will consider the account disputed, will close the account, and will cease any and all Debt Collection efforts related to that account. Further, the settlement agreement between NCOF and the Consumer will be considered null and void as it pertains to the now-disputed account and the Consumer will no longer be held to the terms of such agreement;

(4)     Itemization of the principal balance owed on the account as made available by NCOF's Debt Collection client, if requested by the Consumer, either orally or in writing. If NCOF is unable to

- 2 -

itemize the principal balance owed or cannot obtain that information

from NCOF's client, NCOF will consider the account disputed, will

close the account, and will cease any and all Debt Collection efforts

related to that account. Further, the settlement agreement between

NCOF and the Consumer will be considered null and void as it

pertains to the now-disputed account and the Consumer will no

longer be held to the terms of such agreement;


6.5    **Notices to Consumers**. Within one-hundred fifty (150) calendar days of and for

a period of five years from the Effective Date of this Addendum, NCOF and its owners, officers,

directors, agents, employees, salespersons, Representatives, Independent Contractors, Affiliates,

and all persons or entities in active concert or participation with NCOF in connection with

NCOF's actions as a Debt Collector in the collection of Debts from Consumers shall:

a. Make the following disclosure clearly and conspicuously on the back or

front of each written collection communication issued via automatic print

or processing, whether completed in-house at NCOF or by an outside

printer vendor, that is sent to a Consumer for the purpose of collecting a

Debt:

Federal and State law prohibit certain methods of
debt collection and require that we treat you fairly.
State residents should view our website at
www.ncogroup.com to review your rights under
Federal and State law.

Provision 6.5(a) excludes from this notice requirement only those written
collection communications that are drafted and issued in response to a
specific Consumer inquiry or are drafted and issued to address specific

Consumer needs and are not otherwise based on any type of pre-printed form or template.

b. Make the following disclosure clearly and conspicuously on NCOF's

website, www.ncogroup.com:

> Consumers may request orally or in writing details regarding any debt being collected by NCOF, including an itemization of the principal balance owed, including an itemization of all fees, interest, and any other amount charged to the account.

7.1 NCOF shall maintain measures reasonably necessary to ensure that its Representatives, as defined herein, are properly trained and are otherwise performing their duties in compliance with all applicable laws, including, but not limited to, the CSPA, R.C. 1345.01 et seq., the FDCPA, 15 U.S.C. § 1692 et seq., and/or the FCRA, 15 U.S.C. § 1681 et seq. Further, NCOF shall train its Representatives that if a Consumer requests, either orally or in writing, an itemization or "break-out" of the total Debt owed and NCOF does not already possess the information requested, the Representatives shall contact NCOF's Debt Collection client to obtain that information and, if available, will provide that information to the Consumer. If NCOF is unable to obtain the information from NCOF's client, NCOF shall instruct its Representatives to consider the account disputed, to close the account, and to cease any and all Debt Collection efforts related to that account. Any settlement agreement previously reached between NCOF and the Consumer pertaining to the referenced account will be considered null and void as it pertains to the now-disputed account and the Consumer will no longer be held to the terms of such agreement. NCOF shall further adhere to its policy of disciplining, up to and including the termination of, Representatives that have not complied with the requirements of this Assurance and/or all applicable laws, including, but not limited to the CSPA, R.C. 1345.01 et seq., the

FDCPA, 15 U.S.C. § 1692 et seq., and/or the FCRA, 15 U.S.C. § 1681 et seq. NCOF shall maintain all records referenced in this paragraph and shall, within fourteen days of receiving a request from the Signatory Attorney General, produce a copy of all such records.

7.2 When NCOF hires, retains, and/or enters into an agreement with an Independent Contractor, as defined herein, NCOF shall notify and require, through representations and warranties in their contracts with all Independent Contractors, that each Independent Contractor (1) must comply with the CSPA, R.C. 1345.01 et seq., the FDCPA, 15 U.S.C. § 1692 et seq., and/or the FCRA, 15 U.S.C. § 1681 et seq., (2) refrain from engaging in the acts and practices described in Section VI, Paragraphs 6.2a-6.2ff, and (3) comply with the practices set forth in Section VI, Paragraphs 6.3a-6.3j. Further, NCOF shall clearly and conspicuously notify such Independent Contractor that any and all of their Debt Collection acts and/or practices must be consistent with NCOF's policies and procedures consistent with the terms of this Assurance. NCOF shall train and sufficiently monitor Independent Contractors in accordance with the provisions stated herein. Further, NCOF shall train its Independent Contractors that if a Consumer requests, either orally or in writing, an itemization or "break-out" of the total Debt owed, and NCOF does not already possess the information requested, the Independent Contractor shall contact NCOF's Debt Collection client to obtain that information and, if available, will provide that information to the Consumer. If NCOF is unable to obtain the information from NCOF's client, NCOF shall instruct its Independent Contractors to consider the account disputed, to close the account, and to cease any and all Debt Collection efforts related to that account. Any settlement agreement previously reached between NCOF and the Consumer pertaining to the referenced account will be considered null and void as it pertains to the now-disputed account and the Consumer will no longer be held to the terms of such

agreement. Should NCOF learn that any Independent Contractor is acting in violation of the law or the requirements of this Assurance, NCOF shall immediately take action to enforce its contractual rights with such Independent Contractor regarding the violations, including as described herein. NCOF shall monitor and enforce its contractual rights, up to and including termination of any Independent Contractor which is in violation of the law, this Assurance, or its contract with NCOF.

This Amendment is not intended to apply to any other provisions or subparagraphs of the October 4, 2011 Assurance not listed above. Any and all other paragraphs and subparagraphs in the Assurance executed on October 4, 2011 are still fully valid and enforceable and NCOF shall function in full accordance with that Assurance.

JOINTLY APPROVED FOR ENTRY AND SUBMITTED BY:


Melissa G. Wright (0077843)
Associate Assistant Attorney General
Consumer Protection Section
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
(614) 466-8169
(866) 528-7423 (facsimile)

*Counsel for the Ohio Attorney General*

1/25/12
Date

**FOR NCO FINANCIAL SYSTEMS, INC.**

Joshua Gindin
Executive Vice President and General Counsel

Date 1/23/12

David Israel (LA Bar No. 7174)
Sessions, Fishman, Nathan & Israel, LLC
Lakeway Two, Suite 200
3850 N. Causeway Blvd.
Metairie, Louisiana 70002-7227
(504) 846-7900
(504) 828-3737 (facsimile)
disrael@sessions-law.biz

Date 1/2₀/12

*Counsel for NCO Financial Systems, Inc.*

- 7 -