# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES LACOURTE, on behalf of himself and all others similarly situated,<br><br>                      Plaintiff,<br><br>  - against –<br><br>JPMORGAN CHASE & CO., NCO GROUP, INC. n/k/a EXPERT GLOBAL SOLULTIONS, INC., NCO FINANCIAL SYSTEMS, INC., ONE EQUITY PARTNERS a/k/a ONE EQUITY PARTNERS HOLDING CORPORATION a/k/a ONE EQUITY PARTNERS LLC a/k/a ONE EQUITY PARTNERS II, L.P., FORSTER & GARBUS LLP and DOES 1 THROUGH 150 LAW FIRM AFFILIATES OF NCO GROUP, INC. AND NCO FINANCIAL SYSTEMS, INC.,<br><br>                  Defendants | Case No. 12-CV-9453(JSR)<br><br>Jed S. Rakoff, USDJ |

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT FILED JOINTLY BY JPMORGAN CHASE & CO. AND ONE EQUITY PARTNERS

**TUSA P.C.**
Joseph S. Tusa.
1979 Marcus Avenue, Ste. 201
Lake Success, NY  11042
Tel. (516) 622-2212

**GISKAN SOLOTAROFF ANDERSON**
 **& STEWART LLP**
Catherine E. Anderson
Oren Giskan
Jason Solotaroff
11 Broadway, Ste. 2150
New York, New York 10004
Tel. (212) 847-8315

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................ i.

INTRODUCTION ..........................................................................................................1

PROCEDURAL HISTORY ............................................................................................2

STATEMENT OF FACTS .............................................................................................3

STANDARD OF REVIEW ...........................................................................................10

ARGUMENT
1.       OEP IS DIRECTLY LIABLE FOR ITS OWN UNLAWFUL CONDUCT AND
         VICARIOUSLY LIABLE FOR NCO'S AND NCOF'S UNLAWFUL CONDUCT........ 9

         A.       OEP is Liable for its Own Unlawful Conduct....................................... 13

         B.       OEP is Vicariously Liable for NCO's and NCOF's Unlawful Conduct..............13

         C.       OEP is Liable for the Unlawful Conduct of NCO and NCOF as their Alter
                  Ego or Under Veil Piercing Doctrine.................................... 15

II.      CHASE IS LIABLE FOR OEP'S, NCO'S AND NCOF'S UNLAWFUL CONDUCT.. 17

III.     PLAINTIFF SUFFICENTLY ALLEGES HIS CIVIL
         CONSPRIRACY CLAIMS AGAINST ALL DEFENDANTS.......................................18

         A.       Each Conspiracy Claim is Dependent on Tortious Conduct...............................22

         B.       The Agreements to Further a Civil Conspiracy Need Not Themselves be
                  Unlawful, but the Express Agreements Did Further an Unlawful Purpose or
                  are Unlawful in Whole or Part...............................................................22

         C.       No Immunity Exists for Conspiracies to Violate the FDCPA or FCPA................24

CONCLUSION....................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Amalgamated Sugar Co. v. NL Industries, Inc.*,
    825 F.2d 634 (2d Cir. N.Y. 1987)....................................................................13

*Bodur v. Palisades Collection, LLC*,
    829 F. Supp. 2d 246 (S.D.N.Y. 2011) ............................................................14

*Carte Blanche Pte., Ltd. v. Diners Club Int'l, Inc.*,
    2 F.3d 24 (2d Cir. 1993).  ...............................................................................16

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)........................................................................................24

*Cofacredit, S.A. v. Windsor Plumbing Supply Co. Inc.*,
    187 F.3d 229 (2d Cir. 1999)............................................................................22

*Combs v. NCO Fin. Sys.*,
    2011 U.S. Dist. LEXIS 37000 (E.D. Pa. Apr. 5, 2011) ..................................24

*DeRosa v. Nat'l Envelope Corp.*,
    595 F.3d 99 (2d Cir. 2010)..............................................................................17

*Douyon v. NY Med. Health Care, P.C.*,
    2012 U.S. Dist. LEXIS 141031 (E.D.N.Y. Sept. 28, 2012).............................14

*Eaves v. Designs for Fin., Inc.*,
    785 F. Supp. 2d 229 (S.D.N.Y. 2011) ............................................................21

*Ellis v. Pennsylvania Higher Education Assistance Agency*,
    2008 U.S. Dist. LEXIS 80743, *10 (C.D. Cal. 2008)......................................14

*Fincher v. County of Westchester*,
    1996 U.S. Dist. LEXIS 21588, *77-78 (S.D.N.Y. Feb. 23, 1996)........................19, 21, 23

*Flamm v. Sarner & Assocs., P.C.*,
    2002 U.S. Dist. LEXIS 22255 (E.D. Pa. Nov. 6, 2002)...................................25

*Haddad v. Charles Riley & Assocs.*,
    2010 U.S. Dist. LEXIS 103628 (E.D. Mich. Sept. 30, 2010)..........................20

*Hampton v. Hanrahan*,
    600 F.2d 600 (7th Cir. Ill.1979)......................................................................23

i

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
    175 F. Supp. 2d 593 (S.D.N.Y. 2001) ............................................................23

*Jones v. Federated Fin. Reserve Corp.*,
    144 F.3d 961(6th Cir. Mich. 1998) ...............................................................14

*Kashi v. Gratsos*,
    790 F.2d 1050 (2d Cir. N.Y. 1986) ...............................................................21

*Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*,
    31 F.2d 265 (2d Cir. N.Y. 1929) ...................................................................14

*Kiobel v. Royal Dutch Petroleum Co.*,
    621 F.3d 111 (2d Cir. 2010).........................................................................15

*Lowen v. Tower Asset Management*,
    829 F.2d 1209 (2d Cir. N.Y. 1987)...............................................................15

*Maersk, Inc. v. Neewra, Inc.*,
    554 F. Supp. 2d 424 (S.D.N.Y. 2008) .....................................................19, 21

*Meisel v. Grunberg*,
    651 F. Supp. 2d 98 (S.D.N.Y. 2009) .......................................................20, 21

*McAnly v. Middleton & Reutlinger, P.S.C.*,
    77 F. Supp. 2d 810 (W.D. Ky. 1999)............................................................25

*McNichols v. Moore Law Group*,
    2012 U.S. Dist. LEXIS 26134 (S.D. Cal. Feb. 28, 2012) ..............................13

*Motorola Credit Corp. v. Uzan*,
    274 F. Supp. 2d 481 (S.D.N.Y. 2003) ..........................................................23

*Muzuco v. Re$ubmitIt, LLC*,
    2012 U.S. Dist. LEXIS 110373, *12-15 (S.D. Fla. Aug. 7, 2012) .......13, 14, 25

*Pasqualini v. MortgageIT, Inc.*,
    498 F. Supp. 2d 659 (S.D.N.Y. 2007) ..........................................................20

*Southern New Eng. Tel. Co. v. Global NAPs Inc.*,
    624 F.3d 123 (2d Cir. Conn. 2010)...............................................................16

*Stephen Douglas, Ltd. v. Binet (In re Harvard Knitwear)*,
    153 B.R. 617 (Bankr. E.D.N.Y. 1993)...........................................................21

*Suquilanda v. Cohen & Slamowitz, LLP,*
    2011 U.S. Dist. LEXIS 102727 (S.D.N.Y. Sept. 7, 2011)...................................13

*Telenor Mobile Communs. AS v. Storm LLC,*
    351 Fed. Appx. 467 (2d Cir. 2009)...................................................................15

*Thomson-CSF, S.A. v. American Arbitration Ass'n,*
    64 F.3d 773 (2d Cir. 1995)...............................................................................15

*Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc.,*
    2013 U.S. Dist. LEXIS 6668 (E.D.N.Y. Jan. 16, 2013) ..................................21

**STATE CASES:**

*Barrist v. NCO Group, Inc.,*
    N.Y. Sup. Ct., N.Y. Co. Inds No. 653156, NYSCDF Doc. No. 31 (Jan. 10, 2012) .........12

*Levine v. Philip Morris, Inc.,*
    5 Misc. 3d 1004(A) (N.Y. Sup. Ct. 2004).......................................................25

*Snyder v. Puente De Brooklyn Realty Corp.,*
    297 A.D.2d 432 (N.Y. App. Div. 3d Dep't 2002) ...........................................20

*Velez v Crawford,*
    2012 N.Y. Misc. LEXIS 4893 (N.Y. Sup. Ct. Rich. Co. Sept. 28, 2012).........................25

**STATUTES AND RULES:**

Fed. R. Civ. P. 12(b)(6)   ...............................................................................................1

Plaintiff James LaCourte ("Plaintiff"), by and through his counsel, respectfully submits this Memorandum of Law opposing the joint motion filed pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the *First Amended Class Action Complaint* ("FAC"), dated February 27, 2013, filed by defendants JPMorgan Chase & Co. ("Chase") and One Equity Partners ("OEP").  Chase and OEP filed a single brief in support of their motion (Dkt. No. 44)

## INTRODUCTION

Beginning in 2006 when OEP took NCO private, it used NCO and its subsidiaries as a pawn.  A contemporaneous Management Agreement assured OEP management fees of $3 million annually, while a Stockholders Agreement further assured OEP the right to appoint five (or six) members of NCO's Board of directors, and all members of NCO's subsidiaries' boards. Three OEP Managing Directors currently sit on NCO's Board.

OEP's ownership has been anything but passive.  At least twice since 2006, OEP has forced NCO to merge with other companies owned, controlled and dominated by OEP.  During the same time, OEP has increased its ownership of NCO from 85% to 95%, with Chase owning additional preferred stock.  OEP was paid rich management fees by NCO, in addition to receiving dividends and loan fees paid by NCO to OEP and Chase (or its affiliates).  To the public, NCO and OEP represent NCO to be a "portfolio company" owned and controlled by OEP.  Between the management fees, advisory fees, dividends, OEP (and Chase through dividend and loan fees) reaped a lion's share of revenues from NCO and its subsidiaries' operations, including those derived from its unlawful acts.

Chase also played a significant role. Through a veil of various holding companies and limited partnerships, Chase owns OEP outright.  Chase exclusively funds OEP's operations, and

1

places its management on OEP's boards of directors to supervise its operations. OEP's Managing Partner likewise serves on Chase's Management Committee with Chase's most senior executives. OEP describes itself as existing solely to invest Chase's money and manage those investments. One of those "investments," since 2006 has been NCO. Not content to allow OEP to manage and dominate NCO, Chase has also directed NCO's operations. For example, in 2008 Chase directed NCO to merge with another company owned by Chase's affiliate. NCO had no say in the matter, yet was required to pay Chase's affiliate over $23 million in cash and stock. Another Chase banking affiliate is among NCO's primary lenders, and a customer that provides NCO and NCO Financial Systems, Inc. ("NCOF") with consumer credit card accounts for debt collection.

OEP and Chase argue that they can hide behind their position as "parents" or "stockholders" to immunize themselves for any and all unlawful acts committed by NCO and its subsidiaries. The legal standards say otherwise. First, OEP leveraged its ownership into direct management of NCO's and NCOF's operations, at the most powerful levels, and is directly liable for the NCO's and NCOF's policies and procedures that result in violations of the FDCPA, FCRA and New York GBL §349. Second, OEP's domination and control over NCO and NCOF, and Chase's domination and control over OEP, NCO and NCOF, coupled with the unlawful conduct, render OEP and Chase vicariously liable (even piercing the veil) for violations of the FDCPA, FCRA and New York GBL §349. Last, OEP and Chase voluntarily conspired to promote those same violations by NCO, NCOF and F&G.

## PROCEDURAL HISTORY

Plaintiff adopts and incorporates the Procedural History set forth in Plaintiff's memorandum of law opposing NCO's, NCOF's and F&G's motion to dismiss the FAC.

2

## STATEMENT OF FACTS

Plaintiff James LaCourte has brought this action on behalf of himself and a putative class and subclasses of consumers who have been subjected to the unlawful and deceptive debt collection and credit reporting practices of Defendants, individually and collectively.   FAC¶ 2. As evidenced by Defendants' polices and agreements, Defendants have devised and embarked on a strategy to collect consumer debt which is not owed, or otherwise not valid, by aggressively demanding the payment of false debts, without any investigation and regardless of their validity, and by filing frivolous debt collection lawsuits intended to strong arm settlements or obtain default judgments against consumers.   FAC ¶¶ 3, 20, 21, 27,71.   Given the steep rate of default by consumer defendants in debt collection lawsuits, debt collectors and their creditor clients rarely are required to prove that the alleged debt was, in fact, owed.   FAC ¶¶ 19, 22, 23, 24.   Indeed, consumers appear to defend themselves in approximately only 10% of the debt collection cases brought in the New York Civil Court, and default judgments are entered in the vast majority of debt collection lawsuits filed against consumers.   FAC ¶¶ 19, 22, 25.   Banking on these well documented statistics, Defendants file debt collection lawsuits nationwide based on scant and unverified information when they know, or reasonably should know and intentionally fail to know, that the alleged debt is not owed, in whole or in part, is not valid or collectible, or otherwise cannot be proven in court. FAC ¶¶ 28, 71.

For Plaintiff, Defendants' errant debt collection efforts translated into false credit reporting concerning the false American Express debt.   FAC ¶¶ 63-67.   They have compounded those injuries to Plaintiff by failing to remove or correct the false and inaccurate information in Plaintiff's credit reports.   This pattern of abuse is not unique to Plaintiff.   FAC ¶¶ 31-33 (¶32: "The FTC 2012 FACTA Report concluded that the most frequent cause of errors on consumer

3

credit reports resulted from inaccurate credit reporting concerning collection accounts.").

<strong><small>PLAINTIFF LACOURTE'S EXPERIENCES AND HISTORY</small></strong>

For nearly two years after he fully-settled and repaid a debt to American Express, NCO, NCOF and F&G barraged Plaintiff with twenty-nine debt collection letters and telephone calls. Were that not bad enough, from January 2011 through July 2012, NCO and NCOF instructed F&G to sue Plaintiff (in the name of American Express) for the same false debt. Only when they thought they might get sued, for the first time in July 2012, did NCO and NCOF even bother to investigate whether Plaintiff owed the debt. He did not, a fact they confirmed in a matter of hours (seventeen months too late). Plaintiff continues to be injured by Defendants' conduct, as the false American Express debt continues to appear on his credit reports.

Plaintiff James LaCourte was the holder of an American Express card, which he used primarily for personal, family and household purposes. FAC ¶36. In or about February 2009, Mr. LaCourte negotiated a full settlement of his American Express card debt, and from April 2009 through August 2010, he made the agreed settlement payments of $4,128.02 in full. FAC ¶37. Thus, as of August 2010, Plaintiff LaCourte owed no monies to American Express. FAC ¶37. Nevertheless, beginning in October 2010, NCO, NCOF and F&G launched an abusive and baseless debt collection campaign, falsely representing that Plaintiff LaCourte owed a debt to American Express in the amount of $2,752.01 and demanded in at least twenty-nine separate communications by mail and telephone that he pay the same. FAC ¶38. In several written communications to Plaintiff, NCO, NCOF and F&G each represented, *inter alia*, "this is an attempt to collect a debt[]" and that, "This is a communication from a debt collector." FAC ¶¶ 39, 40. As recently as December 29, 2011, F&G and/or NCO and NCOF placed a telephone call to Mr. LaCourte's residence and falsely represented that he owed a debt of $2,752.01. FAC ¶¶

4

38, 61 (dd).  The last debt collection communication from NCO was dated March 1, 2012.  Tusa Decl., Ex. B.

Plaintiff LaCourte repeatedly informed Defendants that he did not owe the alleged American Express debt. FAC ¶41.  Despite Plaintiff LaCourte's dispute, Defendants failed to take any steps to verify the debt.  FAC ¶42.  On January 17, 2011, F&G, at NCO's and NCOF's direction, filed a lawsuit captioned *American Express Centurion Bank v. James LaCourte,* Index No. 714/11, State of New York, County of Suffolk, 2nd District Babylon (the "*LaCourte Action*"), to collect the alleged American Express debt which Mr. LaCourte had already settled and paid in full.  FAC ¶43.[1] On January 4, 2012, nearly one year after commencing the frivolous debt collection lawsuit against Plaintiff, Defendants had failed to obtain any "media" or other documents concerning the alleged debt.  FAC ¶51.  Had Defendants sought to verify the debt at any time, they would have readily learned (as they ultimately did in one day's time in July 2012) that the debt, in fact, was not owed.  FAC ¶58.  Instead, Mr. LaCourte was subjected to an abusive and harassing lawsuit, in which he was forced to defend himself against baseless claims, appear in court, and retain counsel. FAC ¶¶ 52-56.  On July 27, 2012, more than seventeen months after commencing the frivolous *LaCourte Action*, American Express and Plaintiff executed a *Stipulation of Discontinuing Action With Prejudice*, which confirmed that "the debt claimed in Plaintiff's [American Express'] Complaint is not owed by Defendant [James LaCourte" and was settled and paid." FAC ¶57.

The false American Express debt that Defendants sought to collect from Plaintiff LaCourte was furnished to credit bureaus, including Equifax, Experian and TransUnion, and still appears on Plaintiff's credit reports.  FAC ¶¶ 63, 64.  NCO, NCOF and/or F&G are believed to

---

[1]     That Plaintiff has fully-paid his American Express debt prior to Defendants' debt collection telephone calls, letters and the filing of the *LaCourte Action* is not disputed.  *See Report of the Parties' Planning Meeting Pursuant to Rule 26(f)* (Jan. 29, 2013).

have furnished information concerning the claimed, but false, American Express debt to one or more credit bureaus.  FAC ¶65.  As a result of the false debt appearing on Plaintiff credit reports, Plaintiff was denied credit on or about July 31, 2012, by Bethpage Federal Credit Union.  FAC ¶67.  Because Defendants have not removed the false and inaccurate items from his credit reports, in January 2013, Plaintiff notified the credit reporting agencies to dispute this false American Express debt, and at least one credit reporting agency, Experian, has informed the data furnishers of this dispute as of February 8, 2013.  *See* Tusa Decl., Exs. E, F.

After seventeen months of demanding payment of a false debt from Plaintiff, over his repeated denials, did NCO and NCOF attempt to investigate the validity of his debt.  They only did so then because Plaintiff "filed a complaint which can turn into a lawsuit stating that this account was settled."  FAC ¶59 (quoting NCO email annexed as FAC, Ex. F).  That email further shows that NCO, NCOF and F&G knew that:  i) Plaintiff LaCourte had made every one of his scheduled payments from April 2009 through and including August 2010, even listing those settlement payments by date of payment in a chart included in the email; and ii) another collection agency had been in contact with Plaintiff concerning the same alleged debt.  *Id*. Once they bothered to ask, they learned <u>in a single day</u> that they had been harassing, demanding and suing Plaintiff for a false debt.  They still have not corrected his credit reports.

### THE NAMED DEFENDANTS

Defendant NCO Group, Inc. ("NCO") and its subsidiaries are collectively the largest debt collector in the United States. FAC ¶¶ 17, 90.  NCO is a holding company headquartered at 507 Prudential Road, Horsham, Pennsylvania, which conducts substantially all of its business operations through its subsidiaries, including Defendant NCO Financial Systems, Inc. ("NCOF"), a wholly-owned and controlled subsidiary of NCO, which shares the same corporate

headquarters of NCO.  FAC ¶11.  NCO interfaces with consumers through its network of wholly-owned subsidiaries, including NCOF, which operate as debt collection agencies and through a network of attorney law firm affiliates, including Defendant Forster & Garbus LLP ("F&G") and Defendant Does 1-150, retained for the purpose of debt collection activities, including the filing of debt collection lawsuits against consumers. FAC ¶11.

NCO is 95%-owned, controlled and dominated by OEP and indirectly, owned, controlled and dominated by Chase.  FAC ¶¶ 91, 108, 109.  OEP has dominated and controlled the corporate structure of NCO and used its domination to force several mergers of NCO with other companies dominated and controlled by OEP, including the most recent merger of NCO with APAC in April 2012 into the combined entity named "Expert Global Solutions, Inc."  FAC ¶¶ 114-117.  OEP dominates and controls the board of directors of NCO, and multiple OEP Managing Directors simultaneously serve on NCO's Board.  FAC ¶¶ 119-122.

In turn, all the OEP defendants are owned, funded and beholden to Chase.  FAC ¶¶ 126-129, 132.  Richard Cashin is Managing Partner of One Equity Partners, the President of One Equity Partners Holding Corporation and One Equity Partners LLC, while also serving on the Executive Committee of Chase. FAC ¶130.  Numerous members of One Equity Partners Holding Corporation's Board of Directors simultaneously serve as executive management for Chase. FAC ¶131.  Like One Equity Partners, Chase has used its ownership, dominion and control over NCO to merge NCO with other companies owned and controlled by Chase.  FAC ¶¶ 138, 139. As a result of Chase forcing a merger upon NCO, NCO was required to pay Chase's credit card affiliate $23.25 million in cash and NCO preferred stock.  FAC ¶¶ 139, 140.

Chase further serves and NCO's lender and provides NCO and NCOF with debts to collect for Chases' credit card division.  FAC ¶¶ 135, 137.  Officers of NCO and NCOF were

former Chase executives.  FAC ¶91.  Moreover, the NCO vice president responsible for overseeing the NCO litigation network, reports both to NCO and Chase, and Chase employees oversee and direct the debt collection activities of NCO and NCOF.  FAC ¶¶ 92, 101, 163.

### THE NCO *ATTORNEY NETWORK STANDARD OPERATING PROCEDURE* MANUAL

Central to Defendants' consumer debt collection operation, is the NCO *Attorney Network Standard Operating Procedure* (the "*Attorney Firm SOP*") manual.  This manual applies to all lawsuits commenced on behalf of the creditor clients of NCO and NCOF, including, but not limited to, American Express, Discover Card, Capitol One, Applied Card, Bank of America, Ford Motor Credit, CitiFinancial, Chevy Chase, Direct TV, First Marblehead and NCO Portfolio Management.  FAC ¶71. Defendant Does 1 through 150 Law Firm Affiliates in the NCO and NCOF attorney network are required to follow this manual and are held accountable to its terms when retained by NCO and NCOF for debt collection services, including the filing of collection lawsuits against consumers.  FAC ¶¶ 71, 74, 75.   As admitted by NCO, NCOF and F&G, the NCO *Attorney Firm SOP* confirms that NCO and NCOF control the lawsuits, even though they are often brought in the name of the creditor clients of NCO and NCOF.  FAC ¶¶ 72, 82.

NCO and NCOF apply three key performance measures for affiliate law firms: (1) the speed at which consumer collection accounts are reduced to judgment accounts; (2) the number of consumer collection accounts reduced to judgment accounts; and (3) the amount of money collected on each judgment account.  FAC ¶70.  According to the *Attorney Firm SOP*, NCO and NCOF expect that all forwarded accounts will result in a default judgment against the consumers within 30-60 days from the date of placement with the affiliated law firm.  FAC ¶79.  Affiliate law firms are not paid by NCO and NCOF unless, and until, they obtain a judgment or settlement against the consumer.  FAC ¶80.  A fast recovery, irrespective of the underlying merits of the

debt collection lawsuits, is thus the primary goal, and little to no due diligence is performed. Indeed, the NCO affiliate law firms are not permitted to communicate with the creditors, even though those same creditors are the nominal plaintiffs in the lawsuits filed. FAC ¶¶ 82, 83.  NCO affiliate law firms, moreover, are prohibited from requesting the underlying creditor documents (or "media") necessary to confirm the validity of the debt which is the subject of debt collection by the affiliate law firms, including lawsuits. FAC ¶¶ 84, 86.  The penalty for non-compliance with the *Attorney Firm SOP* standards is termination of the business relationship:

> Failure to follow the above referenced guidelines will result in the end of account placements.  If the Attorney Firm does not meet these requirements, NCO reserved the rights to terminate work on existing, placed accounts.

FAC ¶76 *(*quoting *Attorney Firm SOP* § 4.1.17.1).

The NCO *Attorney Firm SOP* further provides for the mass generation of signature ready affidavits to be used by the affiliate law firms in collection lawsuits. FAC ¶106.  Each day, the NCO and NCOF computer system generates thousands of signature ready affidavits, which are sent back to the original creditor for signature.  FAC ¶ 106.  The original creditor, however, often has little or no knowledge of the underlying debt, and moreover, cannot afford the time to investigate.  FAC ¶¶ 105, 159.  The executed affidavits are returned to NCO and NCOF and forwarded to the Defendants Does 1-150 Law Firm Affiliates.  FAC ¶ 106.

NCO has learned through routine meetings with its creditor clients, including American Express, that its clients have been sending inaccurate consumer collection account information for debt collection. FAC ¶104.  Because NCO and NCOF do not obtain or upload the legacy consumer loan information onto their computerized collections platform, NCO and NCOF cannot verify the accuracy of the limited data points in the electronic consumer information which they obtain from the creditor clients.  FAC ¶¶ 97, 174.  Moreover, the NCO and NCOF

computer interface has been plagued with a glitch which prevents collection accounts that have been paid in full or settled in full from being properly coded and reflected as such, thus causing additional and known erroneous collections. FAC ¶¶100-103.  Despite known problems with the computer systems, collection processes and the information provided by its creditor clients, NCO and NCOF fail to maintain policies and procedures to ensure the legitimacy of alleged debts they and their law firms demand.  FAC ¶¶ 99-101, 178.   Their policies promote the opposite purpose.

## STANDARD OF REVIEW

Plaintiff adopts and incorporates the Standard of Review discussed in Plaintiff's memorandum of law opposing NCO's, NCOF's and F&G's motion to dismiss the FAC.

## ARGUMENT

**I.     OEP IS DIRECTLY LIABLE FOR ITS OWN UNLAWFUL CONDUCT AND VICARIOUSLY LIABLE FOR NCO'S AND NCOF'S UNLAWFUL CONDUCT**

Plaintiff pleads that OEP is a debt collector and furnisher of information to credit bureaus, "both based on One Equity Partners' and its officers' and directors' own direct acts and management of NCO and NCOF, and by reason of One Equity Partners' ownership, control and domination over NCO and NCOF."   FAC ¶13.   OEP assumed direct managerial and financial control over NCO and its subsidiaries in 2006, when, with the assistance of NCO's CEO and COB, Michael Barrist, OEP acquired approximately 85% of NCO's outstanding stock and took the company "private."   FAC ¶¶ 110, 111.[2]  Contemporaneous with the 2006 acquisition, OEP and NCO executed a Management Agreement and Stockholder's Agreement.  FAC ¶¶ 122, 123. The Stockholder's Agreement gives OEP the right to designate a controlling number of members of NCO's Board of Directors. FAC ¶123.  The Stockholder's Agreement states:

---

[2]     OEP's corporate disclosure statement filed in this action reveals that it has increased its ownership stake in NCO to 95% of NCO's parent's stock.  Dkt. No. 46.

2.2. Directors and Voting Agreements

(a) Each Investor agrees that it, he or she shall take, at any time and from time to time, all Necessary Action to ensure that the Board of Directors of the Company is composed at all times of seven (7) persons, including (i) Barrist as Chairman of the Board, (ii) one (1) independent director designated by Barrist and reasonably acceptable to OEP; provided that after Barrist ceases to be Chief Executive Officer of the Company, OEP shall designate such independent director, and (iii) three (3) persons designated by OEP (the "OEP Designees"), and (iv) two (2) persons designated by OEP who shall be independent directors reasonably acceptable to Barrist (the "OEP Independent Directors" and together with the OEP Designees, the "OEP Directors").  ….

Tusa Decl., Ex. G (Stockholders Agreement §2.2(a)).[3]  OEP increased its designations to the NCO Board from five to six of its seven members when Barrist was fired as CEO.   The Stockholder's Agreement also gives OEP the right to appoint <u>all members</u> of the boards of directors of all NCO subsidiaries, including NCOF.   *Id*. (Stockholders Agreement  §2.5). Currently, three OEP Managing Directors serve on NCO's Board of Directors.  FAC ¶¶ 120-123.

The OEP / NCO Management Agreement pays OEP $3 million annually, plus expenses, for managing NCO and its subsidiaries.  FAC ¶¶ 108, 109, 123.  In addition to its Management Agreement fees, described in the Stockholder's Agreement as "regular monitoring fees," OEP was paid $18,500,000.00 to advise on its own acquisition of NCO.  *See* Tusa Decl., Ex. G (Stockholders Agreement, §1.10).  As the owner of 95% of NCO's (and now its parent's) stock, OEP not only controls the NCO Board, but also controls NCO's subsidiaries.  That ownership establishes OEP as the primary financial beneficiary of NCO's and NCOF's debt collection operations, and vests OEP with the power to control NCO's and NCOF's managerial and corporate affairs.  OEP has taken advantage of that power.  Using its control of NCO's Board, it fired Michael Barrist as NCO's and NCOF's CEO.  Speaking to OEP's power over NCO, and

---

[3]      The Stockholder's Agreement was filed in the public record in the lawsuit Barrist v. NCO Group, Inc., N.Y. Sup. Ct., N.Y. Co. Index No. 562091 / 2012 ("*Barrist / NCO Group I*") (NYSCEF Doc. No. 1-1). This Court may take judicial notice of that document, which is also referenced in the FAC.  *See Singh v. Wells*, 445 Fed. Appx. 373, 375 (2d Cir. N.Y. 2011); Fed. R. Evid. 201.

use of that power, Michael Barrist (who remains NCO's COB) stated in a New York lawsuit that:

> The most reasonable conclusion is that NCO and its majority shareholder, OEP, which increasingly function as a single consolidated entity, with utter disregard for the interests of the minority shareholders, including Plaintiffs, are so intertwined that it did not occur to their attorneys in the New York action that any claim against NCO does not invite a response from OEP as a matter of course. Such interconnectedness is evidenced by the fact that both NCO and OEP are represented by the same law firm in the pending Pennsylvania action (though OEP is now no longer a Defendant in the Amended Complaint).

*Barrist v. NCO Group, Inc.*, N.Y. Sup. Ct., N.Y. Co. Inds No. 653156, NYSCDF Doc. No. 31 at 5 (Jan. 10, 2012) ("*Barrist v. NCO II*") Tusa Decl, Ex. H.

There is perhaps no better demonstration of OEP's domination over NCO's affairs than its forced merger of NCO with other companies owned or controlled by OEP. FAC ¶116 (quoting NCO November 29, 2011 Form 8-K: "***At such time, OEP had further informed us that OEP intended to seek to combine APAC with the Company*** [NCO] to build market leadership in business process outsourcing and customer care solutions (referred to as the "Combination") [Emphasis added].").[4] The same thing happened in 2007, when OEP provided $208.9 million for NCO to acquire and merge with another debt collection agency. FAC ¶118.[5]

NCO publicly describes itself as "a portfolio company of One Equity Partners," FAC ¶118, "controlled by an investor group led by One Equity Partners, a private equity firm, and its affiliates [who] "have the power to control our [NCO's] affairs and policies, including the appointment of management." FAC ¶108. OEP's "affiliate" is Chase. FAC ¶¶ 109, 112. "In addition to being liable for its own direct acts, One Equity Partners' ownership, control and

---

[4]    After this merger, NCO changed it name to Expert Global Solutions, Inc. FAC ¶117.

[5]    It is absurd for Chase and OEP to argue that various mergers forced upon NCO by OEP and Chase (*see* FAC ¶¶ 139-140) were legitimate "because NCO's duly-appointed directors voted in favor of them after observing all appropriate corporate formalities," JPMC/OEP Br. at 10-11, when OEP appointed nearly all NCO's directors.

dominion over NCO and NCOF were so extensive as to render NCO and NCOF mere instrumentalities of One Equity Partners."  FAC ¶125.

A.     **OEP IS LIABLE FOR ITS OWN UNLAWFUL CONDUCT**

Since it acquired NCO in 2006, OEP assumed managerial control over NCO and NCOF, for which it was paid an annual management, or monitoring, fee in addition to advisory fees and dividends and distributions resulting from its stock ownership.  Its control over the NCO's and NCOF's boards of directors is further evidence of OEP's active involvement in NCO's and NCOF.  *See Amalgamated Sugar Co. v. NL Indus., Inc.*, 825 F.2d 634, 640 (2d Cir. 1987) ("A board of directors is vested with the authority to manage the affairs of the corporation"); 8 Del. C. §141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation.").  NCO and OEP Holding Corporation are incorporated in Delaware.  FAC ¶¶ 11, 13.

If necessary, OEP is vicariously liable as the parent or alter ego of NCO and NCOF. [6]

B.     **OEP IS VICARIOUSLY LIABLE FOR NCO'S AND NCOF'S UNLAWFUL CONDUCT**

A parent company or principle may be liable for its subsidiary's or affiliate's violations of the FDCPA.  *Suquilanda v. Cohen & Slamowitz, LLP*, 2011 U.S. Dist. LEXIS 102727, *29-30 (S.D.N.Y. Sept. 7, 2011) (FDCPA claims vicariously sustained against Encore defendants); *see also Muzuco v. Re$ubmitIt, LLC*, 2012 U.S. Dist. LEXIS 110373, *12-15 (S.D. Fla. Aug. 7, 2012) (FDCPA claims vicariously sustained against defendant BankAtlantic); *McNichols v. Moore Law Group*, 2012 U.S. Dist. LEXIS 26134, *8-9 (S.D. Cal. Feb. 28, 2012) (FDCPA

---

[6]       While OEP argues that Plaintiff must "pierce the veil" to hold it liable for NCO's and NCOF's acts, OEP has thus far not claimed to be the parent of NCO and NCOF.  Rather, it is represented that NCO is "a portfolio company of One Equity Partners."  *See* FAC ¶108; Dkt. No. 44 at 11 (asserting that OEP and NCO had a "typical management advisory agreement between a private equity firm and its portfolio company.").  Defendants provide no further explanation for they consider a "typical management agreement" in this context.

claims vicariously sustained against defendant Discover Bank).  "To be vicariously liable under the FDCPA, however, the 'principal' must exercise control over the conduct or activities of the 'agent.'"  *Bodur v. Palisades Collection, LLC*, 829 F. Supp. 2d 246, 259 (S.D.N.Y. 2011). Agreements between a parent / principle and a debt collector that result in debt collection proceeds flowing to the parent / principle is sufficient to connote "debt collector" status and plead vicarious liability under the FDCPA.  *Muzuco*, 2012 U.S. Dist. LEXIS 110373 at \*14-15.

Vicarious liability also applies to FCPA claims.  *See Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 966 (6th Cir. 1998) ("Failure to impose vicarious liability on a corporation like Federated would allow it to escape liability for 'willful' or 'negligent' violations of the statute."; referring to 15 U.S.C. §§ 1681n, o); *Haddad v. Charles Riley & Assocs.*, 2010 U.S. Dist. LEXIS 103628, \*10-11 (E.D. Mich. Sept. 30, 2010) *adopting* 2010 U.S. Dist. LEXIS 103623, \*34-36 ( E.D. Mich. Apr. 12, 2010) (sustaining vicarious liability claim under FCRA Section 1681s-2(b)); *Ellis v. Pennsylvania Higher Education Assistance Agency*, 2008 U.S. Dist. LEXIS 80743, \*10 (C.D. Cal. 2008) (The "reasoning supporting a vicarious liability theory does not seem limited to § 1681b.").

Vicarious liability also exists for violations of New York GBL §349.  See *Douyon v. NY Med. Health Care, P.C.*, 2012 U.S. Dist. LEXIS 141031, \*61-68 (E.D.N.Y. Sept. 28, 2012) ("A principal may held liable for its agent's violations of NY GBL §349.  …  Plaintiff may be able to establish vicarious liability on a theory of apparent authority — a question left for the trier of fact.").  The "principle of corporate separateness may be disregarded when a subsidiary acts as an agent of its parent." *See Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265, 267 (2d Cir. 1929) (Hand, J.).  There can be no doubt that Plaintiff has alleged actual ownership and control by OEP over NCO and NCOF.  It is also alleged that public statements made by OEP

and NCO announced to the public that NCO and NCOF were owned, operated and managed by OEP and thus possessed authority under the law of vicarious liability or agency.[7]

## C. OEP is Liable for the Unlawful Conduct of NCO and NCOF as their Alter Ego or Under Veil Piercing Doctrine

OEP's domination and control over NCO and NCOF, and their debt collection and credit reporting policies, coupled with their collective unlawful acts, render OEP the alter ego of NCO and NCOF. A parent company may be held to be the alter ego of its subsidiary when the separate corporate forms are used to achieve a fraud. *Kiobel v. Royal Dutch Petroleum Co*., 621 F.3d 111, 194 (2d Cir. 2010). This principle may also be applied when the subsidiary is so extensively dominated by the parent so that its separate identity may be avoided. *Id*; *Telenor Mobile Communs. AS v. Storm LLC*, 351 Fed. Appx. 467, 469 (2d Cir. 2009) (affirming ruling that parent dominated, and was alter ego of, the subsidiary); *Lowen v. Tower Asset Mgmt., Inc*., 829 F.2d 1209, 1221 (2d Cir. 1987) (noting that federal courts have disregarded corporate formalities when a corporation's owner exercises "total and exclusive domination of the corporation").

While the courts do favor the corporate formalities for companies that perform lawfully, "[i]n some instances, the corporate relationship between a parent and its subsidiary are sufficiently close as to justify piercing the corporate veil and holding one corporation legally accountable for the actions of the other." *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995). "Veil piercing determinations are fact specific and differ[] with

---

[7]       In reciting the veil piercing standards, Chase and OEP add a "distinct and separate" injury requirement absent form the Circuit case law. *See* JPMC/OEP Br. at 7-8. They claim to derive that "distinct and separate" injury requirement from *EED Holdings v. Palmer Johnson Acquisition Corp*., 228 F.R.D. 508, 512-13 (S.D.N.Y. 2005). *EED Holdings* does not say that. Rather, *EED Holdings* was quoting a New York Court of Appeals decision that formulated the veil piercing inquiry as follows: "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Matter of Morris v. New York State Dep't of Taxation and Fin*., 82 N.Y.2d 135, 141 (1993). Chase and OEP have inaccurately described *EED Holdings* and the correct inquiry.

the circumstances of each case," *id.*, and are often inappropriate on a motion to dismiss.  *See Rolls-Royce Motor Cars v. Schudroff*, 929 F. Supp. 117, 122 (S.D.N.Y. 1996).  Exceptions to the adherence of corporate separateness of parents and subsidiaries fall into "two broad situations:" (1) to prevent fraud or other wrong; or (2) where a parent dominates and controls a subsidiary. *Carte Blanche Pte., Ltd. v. Diners Club Int'l, Inc.,* 2 F.3d 24, 26 (2d Cir. 1993).

Among a "number of factors," courts may consider to pierce the veil are whether the subsidiary was undercapitalized, the amount of business discretion displayed by the allegedly dominated corporation, whether the related corporations deal with the dominated corporation at arm's length, or overlap in ownership, officers, directors, and personnel.  *Id* (citations omitted); *see also Southern New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 139 (2d Cir. 2010) (affirming district court denial of the "veil-piercing defendants' motion to dismiss" based on allegations that defendants operated as a "single financial unit" dominated by the parent company).  "Ultimately, the question in any particular case is whether, in light of the circumstances, the policy behind the presumption of corporate independence and limited shareholder liability -- encouragement of business development -- is outweighed by the policy justifying disregarding the corporate form -- the need to protect those who deal with the corporation." *Carte Blanche,* 2 F.3d at 26 (citation omitted).

Plaintiff's allegations support a determination on the pleadings that OEP is liable under either the alter ego or veil piercing analysis as extensively described above.  OEP's and Chase's defense that NCO was not undercapitalized, Dkt. No. 44 at 9, warrants further rebuttal.  In *Barrist v. NCO Group II*, OEP plead a counterclaim against Michael Barrist.  Defending a motion to dismiss that counterclaim, NCO and OEP argued to the New York court that NCO's capitalization since 2006 was precarious and

required multiple restructurings:

> It was not long before Barrist's disinterest and distraction began to negatively impact NCO's financial performance. Id. ¶15. In addition to reporting net losses for 15 consecutive quarters between 2007 and 2011 and having its debt downgraded by both Moody's and S&P, NCO was forced to renegotiate its credit facility three years in a row in order to avoid violating its debt covenants. Id.

*Barrist v. NCO Group, Inc. II*, NYSCEF Doc. No. 33 at 5 (Internal citations to NCO / OPE Counterclaim, NYSCEF Doc. No. 21).  Those OEP I court statements are admissions subject to judicial estoppel.  *See DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010).

Even if not directly liable for its own unlawful conduct, or vicariously liable for NCO's and NCOF's unlawful acts, Plaintiff has adequately alleged that OEP is the alter ego of NCO and NCOF and that veil piercing is appropriate.

## II.     CHASE IS LIABLE FOR OEP'S, NCO'S AND NCOF'S UNLAWFUL CONDUCT

Plaintiff alleges that, "Chase is a debt collector and furnisher of information to credit reporting agencies by reason of its ownership, control and domination over NCO, NCOF and One Equity Partners."  FAC ¶12.  As represented in press releases, SEC filings and OEP's website, the OEP defendants are wholly-owed by Chase and represented to be: "The Private Investment Arm of JPMorgan Chase & Co."  FAC ¶¶ 111, 112, 129, 133-134.   The OEP defendants' "principle business" is "[t]o act as a holding company for JPMorgan Chase & Co. in making private equity investments" and to "make private equity investments for JPMorgan Chase & Co." FAC ¶¶ 126, 127.  The Managing Partner of OEP sits on Chase's Management Committee, and multiple members of One Equity Partners Holding Corporation's Board of Directors simultaneously serve as Chase executive management.  FAC ¶¶ 130, 131.  Chase's corporate disclosure statement admits its ownership over all OEP defendants.  Dkt. No. 42.

Like OEP, Chase used its domination and control over NCO to force it to merge with

other companies owned by Chase, including Systems & Services Technologies Inc. ("SST"). FAC ¶¶ 138, 139.  To acquire SST, NCO was compelled to pay JPMorgan Chase Bank, N.A. $23.35 million in cash and NCO preferred stock.  FAC ¶140.  In addition to being NCO's and NCOF's indirect owner, and deriving dividend payments from NCO, FAC ¶136, Chase is among NCO's lead credit facility lenders that fund NCO's and NCOF's operations.  FAC ¶137. Chase further supports NCO's and NCOF's operations by engaging them to perform debt collection, FAC ¶135 including debt collection alleged to have violated the FDCPA.  It is no surprise that Chase's credit card division has been found to have mimicked similar alleged NCO and NCOF debt collection violations.[8]

Incorporating the legal discussion above, Plaintiffs properly allege that Chase is vicariously liable for the unlawful conduct of OEP, NCO and NCOF that violates the FDCPA, FCRA and New York GBL §349.  Irrespective of those direct violations, it is liable as a conspirator to violate those statutes.

## III.  PLAINTIFF SUFFICENTLY ALLEGES HIS CIVIL CONSPRIRACY CLAIMS AGAINST ALL DEFENDANTS

Counts Fifth through Eighth of the FAC plead civil conspiracy claims.  Those Counts are pleaded separately to allege civil conspiracies to violate different tort claims, against different groups of Defendants, based on different express agreements. Counts Sixth through Eighth further allege implicit agreements, in addition to express agreements, to further the conspiracies, as it is impossible at this stage of the litigation for Plaintiff to plead information wholly within

---

[8]     *See Chase Bank USA, N.A. v. Gersis*, 2011 NY Slip Op 51068(U) (N.Y. Civ. Ct. Kings Co. June 15, 2011) ("In sum, the offered 'robo-testimony' [by Chase] was insufficient to establish its case by a preponderance of the credible evidence.") (dismissing case against *pro se* credit card consumer) (FAC ¶22); *South Shore Adj Co. v Pierre*, 32 Misc. 3d 1227(A), 1227A (N.Y. Civ. Ct. 2011) ("In *Chase Bank USA, NA v. Cardello*, 27 Misc 3d 791, 896 N.Y.S.2d 856 (Civil Ct, Richmond Co. 2010)[] Judge Straniere concluded that bulk assignments by Chase to debt collectors violated every tenet of due process.  …  This practice would merely increase fraud and deceptive and misleading practices which were precisely why the federal Fair Debt Collections Practices Act ('FDCPA') was enacted.").  *See also* FAC ¶23.

Defendants' knowledge and control.  FAC ¶¶ 240, 248, 257; *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 458 (S.D.N.Y. 2008); *Fincher v. County of Westchester*, 1996 U.S. Dist. LEXIS 21588, *77-78 (S.D.N.Y. Feb. 23, 1996) ("An express agreement among all the conspirators is not a necessary element of a civil conspiracy.") (citations omitted).

The separate civil conspiracy counts are pled as follows:

•   Count Fifth (FAC ¶¶ 231 – 235):  Conspiracy to violate New York Judiciary Law §487; *Co-conspirators*:  NCO, NCOF, F&G, Does 1 to 150; *Agreement to further the conspiracy*:  "that the Law Firm Defendants would commence debt collection lawsuits on behalf of NCO and NCOF and/or their creditor clients, when the Law Firm Defendants had no knowledge of the alleged underlying debt, or had not verified the alleged debts or had not performed a diligent investigation of the validity and amount of the alleged debts."  FAC ¶232;

•   Count Sixth (FAC ¶¶ 236 – 243):  Conspiracy to violate FDCPA, FCRA and/or New York GBL §349; *Co-conspirators*:  all Defendants; *Express agreements to further conspiracy*:  (a) the *NCO Financial Systems Attorney Network Standard Operating Procedures* between and among NCO, NCOF and Forster & Garbus (or Does 1 to 150) and (b) the "contract[s] between NCO Financial Systems and our subcontracted attorneys" referenced in Section 2.0 of the *NCO Financial Systems Attorney Network Standard Operating Procedures*. FAC ¶239;

•   Count Seventh (FAC ¶¶ 244 - 251):  Conspiracy to violate FDCPA, FCRA and/or New York GBL §349; *Co-conspirators*:  all Defendants excluding F&G and Does 1 to 150; *Express agreements to further conspiracy*:  (a) the Management Agreement between and among One Equity Partners and NCO; and (b) the Stockholders' Agreement

19

between and among One Equity Partners and NCO.  FAC ¶247;

•    Count Eighth (FAC ¶¶ 252 – 260):  Conspiracy to violate FDCPA, FCRA and/or New York GBL §349; *Co-conspirators*:  all Defendants excluding F&G and Does 1 to 150; *Express agreements to further conspiracy*:  (a) the contracts for debt collection services between and among NCO, NCOF and Chase; and (b) the contracts between and among NCO, One Equity Partners and/or Chase to providing financing or investments for NCO and NCO to perform its debt collection, legal service and credit reporting operations.  FAC ¶256.

A civil conspiracy claim lies in New York where the following elements are present:  (1) an agreement[9] between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury. *World Wrestling Fed'n Entm't, Inc. v. Bozell*, 142 F. Supp. 2d 514, 532 (S.D.N.Y. 2001) (denying motion to dismiss civil conspiracy claim); *Pasqualini v. MortgageIT, Inc..,* 498 F. Supp. 2d 659, 671 (S.D.N.Y. 2007) (same standard and result).  While a conspiracy claim must be related to the commission of a tort, "plaintiff need not allege and prove that each defendant committed every element of the underlying tort" to successful plead a civil conspiracy claim. *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 119 (S.D.N.Y. 2009) (citing *Snyder v. Puente De Brooklyn Realty Corp.*, 297 A.D.2d 432, 435 (N.Y. App. Div. 3d Dep't 2002)).  "A defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives ... is liable as a

---

[9]    As discussed further below, the test requires an "agreement" to further the conspiracy, not that the agreement itself be unlawful on its face.  An agreement that furthers a conspiracy has been termed a "corrupt agreement," but not one necessarily that is entirely unlawful. *See Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir. 1986) ("In alleging conspiracy, the plaintiff carries the burden of proving (1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage.) (citations omitted).

conspirator." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 634 (S.D.N.Y. 2001) (citation omitted; ellipsis in original).

The purpose of a civil conspiracy claim is to extend joint and several liability to co-conspirators who may not have contributed directly to the underlying tort, but are nonetheless liable for the victims' injuries. *Kashi*, 790 F.2d at 1054; *Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc.*, 2013 U.S. Dist. LEXIS 6668, *10-11 (E.D.N.Y. Jan. 16, 2013) (same; motion to dismiss civil conspiracy claim denied); *Meisel*, 651 F. Supp. 2d at 119 ("[T]ort liability may be imposed based on allegations of conspiracy which connect nonactors, who might otherwise escape liability, with the [tortious] acts of their coconspirators, ….") (citations omitted; modification in original); *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 257 (S.D.N.Y. 2011) (same; citations omitted).

On a motion to dismiss, "great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of pleading." *Maersk*, 554 F. Supp. 2d at 458 (citations omitted); *accord Amusement Indus. v. Stern*, 693 F. Supp. 2d 327, 355 (S.D.N.Y. 2010) (same; quoting *Maersk*); *Stephen Douglas, Ltd. v. Binet*, 153 B.R. 617, 628 (Bankr. E.D.N.Y. 1993) ("It should be recognized that the nature of conspiracies often make it impossible to provide details at the pleading stage."); *Fincher*, 1996 U.S. Dist. LEXIS 21588 at *77  (civil conspiracy claim should rarely be denied consideration by a jury because, "[a]bsent the testimony of a coconspirator, it is unlikely that direct evidence of a conspiratorial agreement will exist.").  "Although bare allegations are insufficient to support a conspiracy claim or concerted action liability, courts have recognized the difficulty of pleading with specificity the facts necessary to show the existence of an unlawful agreement." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 175 F. Supp. 2d at 634; *see also Cofacredit, S.A. v. Windsor Plumbing*

*Supply Co. Inc.*, 187 F.3d 229, 242 (2d Cir. 1999) ("As is true in criminal conspiracies, agreements in civil conspiracies will not easily be shown by direct evidence, but may be inferred from circumstantial evidence.").  Plaintiff has satisfied these substantive and pleading standards to sustain each of his civil conspiracy claims.

A.   **EACH CONSPIRACY CLAIM IS DEPENDENT ON TORTIOUS CONDUCT**

Defendants argue that New York does not recognize a claim of civil conspiracy independent from the commission of tortious conduct by one or more of the co-conspirators. Plaintiff agrees, but this principle bears no relation to the civil conspiracy claims pled in this case.  Each claim is confined to a conspiracy to intentionally participate in conduct that violates either the FDCPA, FCPA, New York GBL §349 or New York Judiciary Law ¶487.

B.   **THE AGREEMENTS TO FURTHER A CIVIL CONSPIRACY NEED NOT THEMSELVES BE UNLAWFUL, BUT THE EXPRESS AGREEMENTS DID FURTHER AN UNLAWFUL PURPOSE OR ARE UNLAWFUL IN WHOLE OR PART**

All Defendants contend that Plaintiff fails to plead any civil conspiracy claim, because they self-servingly represent that they did not enter into any "unlawful agreements."  Not only is that argument logically circular, and premature, it misstates the legal standard.  The agreement and overt act necessary to plead a civil conspiracy claim need not themselves be wholly illegal, but merely an intentional act in furtherance of the conspiracies' unlawful ends.  This Court explained the principle:

> The overt act need not itself be tortious or independently actionable in tort to support a cause of action for civil conspiracy. The act need only be overt, *i.e.* "an outward act done in pursuance and manifestation of an intent or design." *Id*. (quoting Black's Law Dictionary 1104 (6th ed. 1990)).

*Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481, 578 (S.D.N.Y. 2003) (Rakoff, J.).[10]  *See*

---

[10]    In *Motorola*, this Court was applying the Illinois civil conspiracy law.  The civil conspiracy standards are the same in New York and Illinois.  *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 175 F. Supp. 2d at 633.

*also Fincher*, 1996 U.S. Dist. LEXIS 21588 at *76-77 (the requisite agreement can be to commit an unlawful act, "or to commit a lawful act by unlawful means, ….") (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 620-21 (7th Cir. 1979)); *cf. In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 175 F. Supp. 2d 593 at 633, 635 (the agreement to commit a civil conspiracy was not claimed to be illegal, but rather a concerted "failure to warn").

Even if an unlawful agreement were required, Plaintiff sufficiently pleads express and implicit agreements in each conspiracy count that are either themselves unlawful, or that furthered the conspiracy to commit the tortious acts.   The NCO *Attorney Firm SOP* and "contract[s] between NCO Financial Systems and our subcontracted attorneys" that codify the terms of the NCO Attorney Firm SOP, the agreements cited in Counts Fifth and Sixth, are alleged throughout the FAC to be rife with unlawful terms that violate the FDCPA, FCRA, New York GBL §349 and New York Judiciary Law §487.   FAC ¶¶ 75-77, 79-84, 106.   The Management Agreement and Stockholder's Agreements between NCO and OEP, the express agreements cited in Count Sixth, provided the funding to NCO and NCOF to maintain their unlawful debt collection businesses under OEP's management and supervision, while diverting profits from those unlawful activities to OEP, and ultimately Chase.   FAC ¶¶ 108, 109, 119, 123, 124; *see Motorola Credit*, 274 F. Supp. 2d at 579 ("Finally, all defendants received money diverted from Telsim, whether directly or through other Uzan-controlled companies.").   The agreements to provide debt collection services between Chase and NCO and/or NCOF and Chase's agreements to provide additional funding to NCO, agreements in Count Eighth, furthered NCO and NCOF's violations of at least the FDCPA Sections 1692c and 1692d.   FAC ¶¶ 109, 135, 137.   Civil conspiracy claims between NOCF and its creditor clients have been sustained over a motion to dismiss.   *See Combs v. NCO Fin. Sys.*, 2011 U.S. Dist. LEXIS 37000,

23

*12-13 (E.D. Pa. Apr. 5, 2011) (NCOF / Capital One agreements that furthered alleged FDCPA violations by NCOF stated claim for civil conspiracy against both NCOF and Capital One).

Defendants misconstrue the FAC by arguing, "Plaintiff does not allege or infer that the agreements were entered into to effectuate an unlawful purpose;" NCO/F&G Br. at 20; *see also* JPMC/OEP Br. at 20.  Plaintiff's civil conspiracy claims plead Defendants' agreements and overt acts to sustain the New York civil conspiracy claims.

## C.   NO IMMUNITY EXISTS FOR CONSPIRACIES TO VIOLATE THE FDCPA OR FCPA

Chase and OEP proffer a novel argument that the Supreme Court has implicitly forbade all civil conspiracy claims to violate federal statutes. Dkt. No. 44 at 20-21. They premise their argument on the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), a decision that neither addressed state conspiracy claims nor the federal statutes pled in this case.  Rather, *First Interstate* held that third parties are not liable for aiding and abetting violations of the federal securities laws. Chase and OEP cite no decision extending *First Interstate's* analysis to civil conspiracy claims premised on violations of either the FDCPA or the FCRA.

To the contrary, since *First Interstate*, numerous courts have sustained civil conspiracy claims to violate FDCPA or the FCRA, including conspiracy claims premised on NCOF's FDCPA violations.  *See Combs v. NCO Fin. Sys.*, 2011 U.S. Dist. LEXIS 37000, *12-14, 16, n.7 (E.D. Pa. Apr. 5, 2011) ("The complaint describes with specificity a course of conduct that, plaintiff claims, constitutes illegal debt collection activities in violation of the FDCPA, and acts taken in furtherance thereof by both NCO and Capital One."  …  The court's "conclusion that plaintiff has failed to plead an FDCPA claim against Capital One is not fatal to plaintiff's civil conspiracy claim."  …  "I will deny Capital One's motion to dismiss as to plaintiff's civil

conspiracy claim (Count II)."); *see also Muzuco v. Re$ubmitIt, LLC*, 2012 U.S. Dist. LEXIS 110373, *22-23 (S.D. Fla. Aug. 7, 2012) (denying motion to dismiss civil conspiracy claim to violate the FDCPA); *Flamm v. Sarner & Assocs., P.C.*, 2002 U.S. Dist. LEXIS 22255, *29-30 (E.D. Pa. Nov. 6, 2002) (same); *McAnly v. Middleton & Reutlinger, P.S.C.*, 77 F. Supp. 2d 810, 815 (W.D. Ky. 1999) (denying motion to dismiss civil conspiracy claim to violate the FCRA).[11]

*** 

Plaintiff adopts and incorporates by reference all arguments made in his brief opposing the motion to dismiss filed by NCO, NCOF and F&G as applicable to Chase and OEP.

## CONCLUSION

For each of the foregoing reasons, and those in the accompanying brief opposing NCO's, NCOF's and F&G's motion to dismiss, Defendants' Motions to Dismiss the *First Amended Class Action Complaint* should be DENIED in their entirety.  To the extent this Court grants any portion of Defendants' motions, Plaintiff requests the right to amend as to those issues and/or claims.

DATED: March 22, 2013

**TUSA P.C.**

/s/ Joseph S. Tusa_____
Joseph S. Tusa
1979 Marcus Avenue, Ste. 201
Lake Success, NY  11042
Tel. (516) 622-2212
Joseph.tusapc@gmail.com

---

[11]    Chase and OEP argue that a civil conspiracy may not lie for a GBL §349 violation.  First they claim that a GBL §349 violation is not "tortious" in nature such as to satisfy the civil conspiracy standard.  Dkt. No. 44 at 22. They are mistaken.  *See Levine v. Philip Morris, Inc.*, 5 Misc. 3d 1004(A) (N.Y. Sup. Ct. 2004) (GBL §349 claim construed as a tort violation).  Citing only a decision addressing civil conspiracy to violate a state civil rights law, Chase and OEP extrapolate that a civil conspiracy claim cannot lie for any state statutory claim.  Dkt. No. 44 at 22. They are mistaken. *See Velez v Crawford*, 2012 N.Y. Misc. LEXIS 4893 (N.Y. Misc. Sup. Ct. Rich. Co. Sept. 28, 2012) (sustaining claim for "civil conspiracy to commit fraud and violations of General Business Law §349").

**GISKAN SOLOTAROFF ANDERSON**
**& STEWART LLP**

/s/ Catherine E. Anderson_____
Catherine E. Anderson
Oren Giskan
Jason Solotaroff
11 Broadway, Ste. 2150
New York, New York 10004
Tel. (212) 847-8315
canderson@gslawny.com
ogiskan@gslawny.com
jsolotaroff@gslawny.com

26